DETROIT & MACKINAC RAILWAY CO. v. MICHIGAN RAILROAD COMMISSION.

1. PLEADING — EQUITY — MULTIFARIOUS BILL — RAILROADS — REVIEWING ORDERS OF RAILROAD COMMISSION.
   The attempted review by bill in chancery of several unrelated orders of the Michigan railroad commission is improper practice.

2. RAILROADS—AUTHORITY OF COMMISSION—LOGGING BRANCHES.
   By the enactment of Act No. 300, Pub. Acts 1909, the legislature has exercised its authority to submit to the supervision of the railroad commission rates of railway companies in general, and including branches of common carriers utilized as

logging roads, for private business, subject to general tariffs of the railway company. Such logging branches are not within the proviso of the law excepting logging or private roads not doing business as a common carrier.

3. SAME — CONSTITUTIONAL LAW — RATES — REGULATION OF CHARGES.

The question whether the rates fixed by the commission are unreasonably low is a question of fact.[1]

4. SAME—STATUTES.

The legislature has not fixed freight rates, beyond prohibiting unjust and unreasonable charges, and confiding to the commission power to ascertain in proper cases whether a rate is unjust, and to make orders in conformity with its findings.

5. SAME — PRIMA FACIE EFFECT OF ORDERS DETERMINING RATES —EQUITY.

The findings of the commission are not conclusive, but have the effect of establishing *prima facie* whether the rates are reasonable or unreasonable, and they remain in force until modified or set aside by the courts.

6. SAME — EVIDENCE — DISCRIMINATORY CHARGES — ESTOPPEL — EFFECT.

Railroad corporations are not bound by the publication of too low or discriminatory rates so as to be barred from questioning an order of the commission fixing rates on the basis of their lowest published tariffs.

7. SAME—VALUATION—INCOME OR REVENUE.

For the purpose of determining the reasonableness of published rates the commission is bound to take into consideration the fair value of the property as a producing factor, not necessarily the cost of construction or amount expended, although the last is a factor to be considered, together with the cost of permanent improvements, value of bonds and stock, etc.

8. SAME—EVIDENCE—TAXATION.

The assessed valuation of a railroad is entitled to weight in fixing its value.

9. SAME.

The burden is on complainant, asking the court to set aside the order of the railroad commission, to produce evidence within its control, showing the value of its assets.

[1] Elements entering into determination of reasonableness of railroad rates prescribed by the State for local traffic, see notes in 15 L. R. A. (N. S.) 108 and 25 L. R. A. (N. S.) 1001.

Legislative power to regulate rates generally, see note in 33 L. R. A. 179.

10. SAME.

While from the public character of the work that railroads perform, the public has the power to prescribe rules for securing faithful and efficient service, and equality between shippers and among the several communities served, the public is in no proper sense a manager.

11. SAME—CONTRACTS WITH CARRIERS.

Railroads may contract with shippers for a single transportation, or for successive transportations, subject to change of rates under the law, and in fixing their own rates they may take into account genuine competition with other carriers.

12. SAME—CONSTITUTIONAL LAW.

Evidence examined, and *held,* not to sustain complainant's contention that rates fixed by order of the Michigan railroad commission were confiscatory.

Appeal from Wayne; Murfin, J. Submitted November 16, 1911. (Docket No. 98.) Decided July 22, 1912.

Bill by the Detroit & Mackinac Railway Company against the Michigan railroad commission to review orders fixing certain freight rates of the Detroit & Mackinac Railway Company for timber and forest products. The Onaway Shingle & Tie Company and others intervened as complainants; the Fletcher Paper Company and others as defendants. From a decree for defendants, said complainant and interveners appeal. Affirmed.

*James McNamara,* for complainant railway company.

*Fred A. Baker,* for intervening complainants.

*Franz C. Kuhn,* Attorney General ( *Charles W. McGill* and *George S. Law,* of counsel), for defendant commission.

*Gillett & Clark,* for intervening defendants.

OSTRANDER, J. To the Michigan railroad commission four complaints were made against the complainant, the Detroit & Mackinaw Railway Company, three of them by the Fletcher Paper Company of Alpena, Mich., the other

171 MICH.—22.

by F. W. Gilchrist, Churchill Lumber Company, and Island Mill Lumber Company. Three complaints were answered by the railway company, a hearing was had, and the commission made three separate orders, one of them a supplemental order, dated, respectively, October 19, 1909, October 22, 1909, and November 3, 1909. In November of the same year, the railway company, being dissatisfied with the said orders, filed its bill in the circuit court for the county of Wayne, in chancery, against the said commission to vacate them. The parties complaining before the Michigan railroad commission were permitted to intervene as defendants in said suit, and certain other parties, claiming to be interested in and affected by the said orders, were permitted to intervene as complainants. Answers were filed and testimony, including that reported by the commission, was introduced. The whole of the testimony was referred by the court to the commission, which reported that—

"This defendant, the Michigan railroad commission, has carefully considered the testimony in said cause, and copy of which was transmitted to it, as aforesaid, and in addition thereto and in connection therewith, has made a thorough inspection of all the branch roads of said complainant, the Detroit & Mackinac Railway Company, affected by said orders, the method of transporting forest products thereon, and the attending conditions and circumstances incident to the transporting of forest products therefrom to the city of Alpena and intermediate points, and also the transporting of manufactured products from the city of Alpena to various points on the line of the Detroit & Mackinac Railway Company and its connections. That, after a careful consideration of such evidence and the investigations made by this defendant, the Michigan railroad commission, in connection therewith, as aforesaid, and the many facts and circumstances, including the character of the service required and the expense incident thereto, it is the opinion and judgment of this defendant, the Michigan railroad commission, that the three orders complained of should not be rescinded, altered, modified, or amended in any particular."

It also reported:

"That it is the opinion of this defendant, the Michigan railroad commission, that the evidence introduced in behalf of complainant, respecting the cost of operation, should not be taken as in any manner conclusive, for the reason that it admittedly relates to a subject with respect to which there is no known definite method of computation, which fact clearly appears from the evidence submitted in said cause. That this defendant, the Michigan railroad commission, further reports that it has on file the annual report of the complainant, the Detroit & Mackinac Railway Company for the year ending June 30, 1910, showing a net earning of (8.7%) eight and seven-tenths per cent. on the value of its road, as shown by its verified amended bill, which said report was filed with the Michigan railroad commission on the 17th day of October, 1910, a certified copy of which is hereto attached and\ made a part of this report."

The cause proceeded to a decree, which was entered February 11, 1911, which dismissed the bill of complaint, with costs. It is in this court upon the appeal of the said complainant railway company and upon the appeal of the intervening complainants from said decree.

Details of the controversy will appear as discussion proceeds. It is sufficient to say here that the railway company published three tariffs, one of them, in effect January 19, 1909, a local freight tariff on logs of all kinds in car loads, minimum 2,500 feet per car, from points north and south of Alpena to Alpena, known as M. R. C. 205, one a local freight tariff on bolts and logs of all kinds between local stations, known as M. R. C. 208, in effect February 20, 1909, and one a local freight tariff naming switching charges between Alpena and Fletcher's Dam, effective March 14, 1909, which increased the switching charge from $2 to $5. The effect of the orders of the Michigan railroad commission is to cancel the tariff M. R. C. 205, to substitute for it M. R. C. 208, with a provision for an additional charge, if products of the logs are not shipped out via complainant road, and to decrease the switching charge complained about to $3.50. The orders are here set out. The order of the Michigan railroad com-

mission, made upon the complaint of Gilchrist, Churchill Lumber Company, and Island Mill Lumber Company, requires the railway company to publish, file, and put in operation a tariff for the transportation of logs in car load lots, as follows:

Ten (10) miles or less, not to exceed one dollar ($1.00) per thousand (1,000) feet;

Over ten (10) miles and not exceeding twenty (20) miles, not to exceed one dollar and thirty-three cents ($1.33) per thousand (1,000) feet;

Over twenty (20) and not exceeding thirty (30) miles, not to exceed one dollar and sixty-seven cents ($1.67) per thousand (1,000) feet;

Over thirty (30) and not exceeding fifty (50) miles, not to exceed two dollars ($2.00) per thousand (1,000) feet;

Over fifty (50) and not exceeding eighty (80) miles, not to exceed two dollars and thirty-three cents ($2.33) per thousand (1,000) feet;

Above rates to apply when the manufactured product is reshipped via defendant company's line, and when not so to be reshipped, that defendant company are authorized to collect in addition to said rate, fifty cents (50c) per thousand (1,000) feet, but if later reshipment is made over defendant company's line, they are to refund to such shipper the fifty cents (50c) per thousand (1,000) feet collected; and

It is further ordered, that the books of both defendant company and complainants (and all other shippers of logs affected by this order) shall show plainly the total of inbound shipments and the reshipment of the manufactured product; and

It is further ordered, that these rates apply to all classes of logs transported by said defendant to said city of Alpena within the distances above set forth.

No minimum load being specified in this order, the commission made the supplemental order, which not only corrects the omission noted, but contains a further distinct order, made upon a distinct complaint of the Fletcher Paper Company. The said order reads:

Now, therefore, by virtue of the authority vested in us by law, it is hereby ordered, that the said defendant company may charge a minimum rate per car on carload shipments covered by this order the same as now appears in defendant company's tariff, described as M. R. C. No. 208, G. F. D. No. 560 (corrected), now on file with this commission, to wit:

Not to exceed ten (10) miles, three dollars ($3.00) per car;

Not to exceed twenty (20) miles, four dollars ($4.00) per car;

Not to exceed thirty (30) miles, five dollars ($5.00) per car;

Not to exceed fifty (50) miles, six dollars ($6.00) per car;

Not to exceed eighty (80) miles, seven dollars ($7.00) per car;

Not to exceed one hundred (100) miles, eight dollars ($8.00) per car;

Not to exceed one hundred and twenty-five (125) miles, nine dollars ($9.00) per car;

Not to exceed one hundred and fifty (150) miles, ten dollars ($10.00) per car; and

It is further ordered, that on all carload shipments of logs or pulp wood originating at points on defendant company's line of railroad north of Fletcher's Junction the rate to Fletcher's Dam (formerly Broadwell's Dam) shall be the same as the rate to Alpena, and that on all carload shipments of logs or pulp wood originating at points on defendant company's line of railroad south of Alpena the rate to Fletcher's Dam (formerly Broadwell's Dam) shall be the same as the rate to Alpena.

The other order, made on the complaint of the Fletcher Paper Company, is:

The above-named Fletcher Paper Company having duly filed its complaint with this commission, charging in substance, among other matters, that the local freight tariff, naming switching charge between Alpena, Mich., and Broadwell's Dam (sometimes called Fletcher's Dam), M. R. C. No. 217, is unreasonable and unjustly discriminatory, and after due notice to all parties concerned, and a hearing having been had thereon and after duly considering the evidence and arguments of counsel, and it appearing to the commission that the rate named in the local freight tariff, M. R. C. 217, to wit, $5.00 per car in each direction on all commodities between the city of Alpena and said Broadwell's Dam, is unreasonable and unjustly discriminatory, and it appearing to the commission that $3.50 a car in each direction between said city of Alpena and Broadwell's Dam on all commodities is reasonable and just;

Now, therefore, by virtue of the authority vested in us by law, it is ordered, that said defendant, the Detroit & Mackinac Railway Company, within twenty days from the date of service of a certified copy of this order on it, file, publish, and put in force a rate for switching charge between Alpena, Mich., and Broadwell's Dam, not to exceed $3.50 per car in each direction on all commodities;

Ordered further, that M. R. C. No. 217 heretofore filed and published by said defendant, be canceled and that said Detroit & Mackinac Railway Company cease and desist after said twenty days

from charging more than $3.50 per car in each direction between Alpena, Mich., and Broadwell's Dam for any commodity.

The complaints which were made fairly present for determination the matters disposed of by these orders.

In this court briefs have been filed in behalf of the railway company, in behalf of the intervening complainants, in behalf of the Michigan railroad commission by the attorney general, and in behalf of the intervening defendants by other counsel.

The questions debated are:

(1) Whether the branch roads or stems built by the complainant for the Alpena lumbermen are private logging roads, over which, and over the operation of which, the Michigan railroad commission has no jurisdiction. It is to logs moved out of and over these branches that the specific rates given in M. R. C. 205 apply.

(2) Whether the rates established by M. R. C. No. 205 are unjust and unduly discriminatory. In this connection, it is insisted that the effect of the orders is to diminish the total income of the complainant to a point below what it is fairly entitled to receive.

(3) Whether the switching rate of $5 per car to Fletcher's Dam is unreasonable and excessive.

(4) Whether the requirement that Fletcher's Dam be made a receiving station for freight is reasonable.

While we have concluded to examine each of these contentions, we do not approve the practice of reviewing in one bill several unrelated orders of the Michigan railroad commission.

1. The statute (Act No. 300, Pub. Acts 1909) creating the Michigan railroad commission expressly provides:

"Sec. 3. (a) The term 'common carrier' as used in this act shall be construed to mean and embrace all corporations, companies, individuals, associations of individuals, their lessees, trustees, or receivers, appointed by any court whatsoever who now or may hereafter own, operate, manage or control as a common carrier in this State any railroad or part of any railroad, whether operated by steam, electricity or other motive power, or cars or any other equipment used thereon, or bridges, switches, spurs, tracks, side tracks, terminal facilities, or any docks,

wharfs or storage elevators used in connection therewith, or any kind of terminal facilities used or necessary in the transportation of persons or property designated herein, and also all freight depots, yards and grounds used or necessary for the transportation or delivery of any said property and whether the same are owned by said railroad or otherwise; or any express company, car loaning companies, freight or freight line companies and all associations or persons, whether incorporated or otherwise, that shall do business as common carriers upon or over any line of railroad in this State, or any common carrier engaged in the transportation of passengers and property wholly by rail or partly by rail and partly by water."

" (*c*) The term ' railroad ' as used in this act shall be construed to mean all railroads, whether operated by steam, electric or other motive power: *Provided,* that the provisions of this act shall not apply to any logging or other private railroad not doing business as a common carrier."

" Sec. 14. The commission shall have control over private side tracks in so far as the same are used by common carriers."

Section 14 was amended (Act No. 139, Pub. Acts 1911) so as to read:

"The commission shall have control and jurisdiction over all side tracks, spurs, and branches in so far as the same are used or operated by common carriers. No change or discontinuance in the service from, to or on such side tracks, spurs and branches or abandonment or removal of said side tracks, spurs or branches, except sidetracks or spurs solely required for the convenient operation of its engines and trains and private industrial side tracks, shall be made except "—after notice to the commission and to the public.

The meaning of the proviso " that the provisions of this act shall not apply to any logging or other private railroad not doing business as a common carrier " is not entirely clear. Much may be said in favor of the proposition that any railroad ought to be permitted to build or operate temporarily, and by private arrangement, a branch line for the convenience of a patron, without subjecting its agreement or its performance thereof to public super-

vision. Contrariwise, it is apparent that a railroad might in this way greatly prefer an individual, or company, over others similarly situated. The language of the proviso does not suggest the meaning that common carrier railroads are excepted from the jurisdiction of the commission with respect to operations upon and over temporary branch lines, whether logging operations or others. On the contrary, apt language is used to express the idea that private railroads alone are excepted, and not those if they do business as a common carrier. Complainant. is not a private railroad. It does business as a common carrier. Its branch lines have been laid and operated for the convenience of timber owners, it is true, but for the convenience of all of them whose timber was so conveniently reached by the branch. Branches have been extended, new branches have been run from those first laid, and the purpose has been to reach with each branch such timber as was offered for transportation. It has published tariffs giving rates to the ends of branches, and has filed them with the commission. With a single exception, and that does not apply to an Alpena log owner, it does not appear that its rates for transporting timber from any of its branches are contract rates.

What its duties and liabilities in the operation of its branches are or would have been at common law is not very material. We have no doubt of the power of the legislature to require it to submit those operations to State supervision. The question is whether it has done so, and this question, we think, must be answered in the affirmative.

2. Were the rates fixed by M. R. C. 205 unreasonable or unduly discriminatory? Are the rates .fixed by the commission unreasonable and unjust? These are questions of fact. The rates established by the Michigan railroad commission are lower than any ever demanded or paid by Alpena lumbermen for similar service. They are lower than any ever published by the complainant, if

we except its tariff M. R. C. 208. We think it appears that they are lower than any which Alpena lumbermen ever hoped to have established. The rates applied to the business done by the railroad in 1909 would effect a reduction of revenue estimated by defendant interveners at about $21,000 and by complainant at about $34,000. If complainant is right, the reduction would exceed one-tenth of the total net revenue of the road as reported. Intervening complainants, who do business at stations north of Alpena and south of Cheboygan, one of them having more than $600,000 invested in lumbering and in manufacturing logs and lumber, contend that the rates fixed by the commission favor Alpena lumbermen, excluding all others from the market in which small quantities of logs are offered for sale. Intervening defendants contend that M. R. C. 208 gave an advantage to all log owners, except those in Alpena. The importance of the question presented to complainant, to log owners, and log buyers, and indirectly to the public, is evident. It is said in the brief for intervening defendants:

"From the standpoint of the intervening defendants, there is practically but one question before this honorable court, and that question briefly is: Do the orders of the railroad commission, substituting M. R. C. 208, as modified by imposing a penalty of fifty cents a thousand when the manufactured product is not shipped out by rail, reducing the switching charge between Alpena and Fletcher's Dam from $5 to $3.50, and making Fletcher's Dam a point to which pulp wood can be consigned at Alpena rates, result in such depreciation or loss to the complainant railway company as to amount to confiscation? There is an equally important question which, so far as we know, has never been passed upon by the courts, viz.: Can the railway company discriminate in rates and then claim that, if rates are equalized on the basis of the lowest, it would result in such a loss of income as to be confiscatory? We believe that the answer to this will be in the negative, because the company brought the situation upon itself by unlawful discrimination, and because the commission is always in session, and upon a proper showing redress could be had."

We apprehend that the words "reasonable and just" in the statute do not mean nonconfiscatory, as the word "confiscatory" is usually defined. The legislature has not fixed the freight rates to be charged by complainant beyond this: It has prohibited and made unlawful every unjust and unreasonable charge. It permits reasonable and just rates to be charged for services performed. It has confided to the Michigan railroad commission the power, with the duty, to ascertain, in proper cases, whether a rate is reasonable and just or unreasonable and unjust, and to thereupon make an order in conformity with the facts. The facts being found, it is the legislature which speaks, approvingly or disapprovingly, as the case may be. The important business of the commission with respect to rates is ascertaining facts. Its findings are not conclusive, but have the effect of establishing *prima facie* that the rates considered are reasonable and just and therefore lawful, or are unreasonable and unjust and unlawful. Its orders stand until modified or set aside by it or by the courts. The duty of the courts in the premises is not essentially different from that of the commission. No different conclusion was stated in *Michigan Central R. Co.* v. *Wayne Circuit Judge*, 156 Mich. 459 (120 N. W. 1073, 16 Am. & Eng. Ann. Cas. 832). It is only after determining that the rate fixed by the commission is unreasonable that the court may set it aside. Presumptively, the findings and orders of the commission are right. If attacked, the complainant has the burden of showing "by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable, as the case may be."

The difficulty and perplexity of such an inquiry would deter any one, to whom the task was not a duty, from pursuing it, in the first instance, and from reviewing a determination once made. It is unfortunate that the courts do not have the assistance which would be derived from a finding made by the commission which would distinctly state the ultimate facts found and the factors, at

least the controlling factors, considered in determining whether a rate was or was not reasonable. We notice, in this connection, that in returning the testimony to the circuit court the commission states that its original conclusions are confirmed by a personal examination of the locality in which the service of complainant is performed, and by knowledge acquired independent of the testimony produced before it. Manifestly, this court cannot share in knowledge so acquired, unless evidence of the facts discovered, or supposed to have been discovered, is in some way brought upon the record.

What has been said indicates, sufficiently perhaps, disapproval of the suggestion that a low discriminating rate for services ought to be imposed as a punishment for publishing such a rate; that a low rate intended by the railroad company to apply to a limited traffic ought to be continued as the rate for all traffic upon the theory that the railroad company is bound not to question the result. The legislative test of a rate has been stated. The legislature has imposed penalties for disobedience of the law. A rate cannot be held to be just and reasonable solely because a railroad company has performed services for the indicated charge.

In so far as the original complaints were based upon a comparison of rates to Alpena and rates to Cheboygan, we make no inquiry, for the reason that the said tariff to Cheboygan was canceled by the railway company before the commission made its investigation.

The principal revenue of the railroad has been derived from its freight service. More than one-half of its freight revenue is derived from logs, lumber, and other forest products, manufactured and unmanufactured, transported by it. The destination of the greater portion of logs carried is Alpena, a water port; and the greater portion of the logs delivered there are made into lumber, finished and unfinished, and shipped out by water. The quantity of pine, logs, or lumber transported is negligible. The timber remaining, in any way tributary to the road, is

hard wood and hemlock; and at the present rate of removal the large tracts and most of the standing timber will be marketed in from five to seven years. The country through which the road runs is sparsely settled. Prior to 1893, the Detroit, Bay City & Alpena Railroad extended from a point 40 miles north of Bay City, where it connected with the northern division of the Michigan Central Railroad, to the city of Alpena. It was built for, and used, at least principally, as a logging railroad. It was sold at receiver's sale in 1893. It was rehabilitated by the purchaser, found a southern terminus in the city of Bay City and a northern terminus in the city of Cheboygan, with respect to which termini Alpena is 70 miles south of Cheboygan and 126 miles north of Bay City. Its main line traverses the counties of Bay, Arenac, Alcona, Iosco, Alpena, Presque Isle, and Cheboygan, the total population of which counties, according to the census of 1910, was 132,420, and, excluding the county of Bay, 74,188. The most considerable settlement reached by the road is the city of Alpena, which, by the said census, had a population of 12,706. From Alpena north to Cheboygan, and from Alpena south to East Tawas, the stations on the main line, and the distances from Alpena, are shown in the following table:

| | |
|---|---|
| Alpena north to Cathro | 7.6 miles |
| Bolton | 10.0 " |
| Polaski | 14.9 " |
| Posen | 17.6 " |
| Metz | 22.9 " |
| La Rocque | 27.3 " |
| Bunton | 30.3 " |
| Millersburg | 36.1 " |
| Case | 39.7 " |
| Onaway | 44.8 " |
| Tower | 48.7 " |
| Waveland | 53.2 " |
| Aloha | 62.9 " |
| Inverness | 67.5 " |
| Cheboygan | 71.6 " |

South to Ossineke _____ 13.2 miles ·
     Black River _____ 22.9  "
     Alcona _____ 27.2  "
     Sturgeon Point_____ 30.4  "
     Harrisville _____ 33.8  "
     Greenbush _____ 39.4  "
     Lincoln Junction_____ 46.1  "
     Au Sable _____ 51.6  "
     Kunze Siding_____ 58.8  "
     Tawas Beach _____ 62.8  "
     East Tawas_____ 64.8  "

To reach timber not immediately upon the line of the road, it has built stems or spurs running from its main line into the timber, and in many cases from these stems or extensions so built numerous shorter branches have been laid to reach bodies of timber and facilitate the movement of forest products. Along many of these branches the timber has been exhausted, and they are no longer operated by the railway company, which has taken up its iron and, as it was available, relaid it upon other stems or branches of the road. The branches which are now, or were until recently, operated by it "for freight traffic only," and the mileage of each, are:

Branches Operated for Freight Traffic Only.
Bloom Branch.
   Waveland to Bloom Branch Junction_____ 1.8 miles
   Bloom Branch Junction to end of rails_____ 1.5  "
Cleveland Branch.
   Tower to end of rails_____ 11.5  "
   Tower to Wolverine Branch Junction_____ 6.5  "
Wolverine Branch.
   Cleveland Branch Junction to end of rails_____ 1.0  "
   Tower, via Cleveland Branch to end of rails_____ 7.5  "
Indian River Branch.
   Tower to end of rails_____ 2.2  "
   Tower to Le Grand _____ 8.1  "
Black Lake Branch.
   Black Lake Junction, Black Lake_____ 5.2  "
   Onaway to Black Lake Junction _____ 0.6  "
Tubbs Branch.
   Millersburg to Tubbs Branch Junction_____ 4.5  "
   Tubbs Branch Junction to end of rails _____ 5.0  "

Hurst Branch.
    La Rocque to Hurst_____ 5.1 miles
    La Rocque via Hurst Branch to end of rails_____ 10.0   "
Kimball Branch.
    Polaski to end of rails_____ 5.6   "
Gates Branch.
    South Branch to end of rails_____ 8.4   "
Prescott-Miller Branch.
    Rose City to end of rails_____ 9.4   "

Three, and perhaps more, of the stems of railroad which
have been so built from the main line thereof have been
constructed at the expense of, and they are owned by, the
Detroit & Mackinac Railway Company.  It has been the
custom, however, to build the smaller branches and some
of the stems with which such smaller branches connect by
arrangement between the railway company and the owners
of timber.  In this respect, the arrangements which have
been made vary somewhat; but usually the arrangement
was that the timber owner furnished—acquired, by lease
or otherwise, if he did not own—the right of way, graded
the roadbed, and sometimes furnished the ties, and the
railway company furnished and laid the iron and operated
the road.  It was not an uncommon thing for the timber
owner, who so joined in constructing the stem or branch,
to charge other owners of timber tributary thereto a cer-
tain rate or price per thousand feet for all forest products
which the railway company moved for such other land-
owner over the branches and stems so acquired and so
operated.  The equipment—that is, cars and locomotives
—have always been furnished by the railway company.

    Prior to 1907, the rates charged by the railway com-
pany for moving forest products which came to its main
line from the tributary stems or branches were, in many
cases, agreed upon by the railway company and the tim-
ber owners, and were not uniform; often two or three dif-
ferent rates were made for moving forest products from
the same stem or branch to the city of Alpena.  There was
a difference in the rate charged for moving hard wood
and that charged for moving hemlock, after hemlock

came to be a merchantable commodity, a thousand feet of hemlock weighing from 2,500 to 3,000 pounds, depending upon how dry it is, and a thousand feet of hard wood, like maple, depending upon the same condition, weighing from 4,000 to 4,500 pounds.   To secure the lesser rate on hemlock, it was the rule to bank or skid and load hemlock separate from hard wood, because if any considerable portion of the carload of logs was hard wood the rate charged for transporting it was the hard wood and higher rate. The Alpena log owners desired to have the railway company make a rate for transporting logs which would permit the loading of logs without separating the hemlock from the hard wood.   As tersely put by some of them, it was desired to have a tariff under which a log would be a log.   In February, 1907, one of the intervening defendants, the Churchill Lumber Company, addressed to the railway company a letter, which is here set out as indicative of the desires of that lumber company, and, to some extent at least, of other Alpena log owners at that time:

"Alpena, Michigan, February 12, 1907.
" Mr. T. G. Winnett,
   " General Freight & Passenger Agent,
                    " D. & M. Railroad,
                    " Bay City, Michigan.
   " *Dear Sir:*   As per conversation with the writer in your office on the 8th inst., relative to naming us a rate for hauling mixed logs, and with a view of your naming us a rate based on our present rate that will be fair to both of us, we submit you the following figures as to our holdings, based on estimates of our land-looker, Mr. W. S. Tubbs, and on which we have purchased the timber.   On his estimates, we now own fifty million feet adjacent to your road, of which sixty per cent. is hemlock and forty per cent. is hard wood.   Of this amount 35 millions is located from La Rocque to Alpena, and fifteen millions above La Rocque.   In the 35 millions is included about one million feet that will come to your tracks on the Hurst Branch, and at the Water Tank Siding at La Rocque. The balance is all from La Rocque station to Alpena. The 15 millions coming to your tracks above La Rocque will be from Bunton's Crossing and above, but

mostly from the Tubbs Branch. Our present rate from
La Rocque to Alpena is $2.50 per thousand on hemlock
and $3.25 per thousand on hard wood. Based on our
holdings of sixty per cent. hemlock and forty per cent.
hard wood, the average rate would be $2.80 per thousand.
Our present rate from points above La Rocque to Alpena
is $2.75 per thousand on Hemlock and $3.75 per thousand
on hard wood. Based on our holdings of sixty per cent.
hemlock and forty per cent. hard wood, the average would
be $3.15 per thousand. On this showing we will ask you
to make us a rate on mixed logs from La Rocque to Al-
pena, including the Hurst Branch, and the Water Tank
Siding at La Rocque, of $2.75 per thousand, and from the
Water Tank Siding at La Rocque, and above to Alpena
of $3.00 per thousand. As we explained to your Mr.
Luce and yourself, we believe a rate on mixed logs would
be advantageous both to your company and ourselves, not
as a financial loss or gain to either of us, so far as the rate
is concerned, but it would facilitate the loading and hand-
ling of the cars, as it is impossible at times to load all cars
placed for us either with all hemlock or all hard wood,
and this necessitates an extra switch on your part and a
loss of time on our part.

"Trusting for an early and favorable consideration of
our request, we remain yours very truly,
                "CHURCHILL LUMBER COMPANY,
"F. A. KIMBALL, Secretary and General Manager."

Later, in November of the same year, a conference was
had between agents of the railway company and Alpena
log owners or their representatives. Just what was said,
what demands or requests were made during the confer-
ence, is not clear; those who were present and who gave
testimony being to some extent in disagreement. The
railway company, claiming that in so doing it met the
special request indicated by the foregoing letter and the
general request expressed by the Alpena log owners,
issued and published the local freight tariff on logs of all
kinds in car loads, minimum 2,500 feet per car, from
points north and south of Alpena to Alpena, known as M.
R. C. 205. The railway company also issued the local
freight tariff M. R. C. 208. Both were in effect when the

complaints were made to the Michigan railroad commission. These tariffs are here set out:

M. R. C. No. 205          G. F. D. 555
Cancels M. R. C. No. 198          Cancels G. F. D. No. 548
Advance Reduction

DETROIT & MACKINAC RAILWAY COMPANY,
"Turtle Route"
Local Freight Tariff
on
Logs (all kinds, carloads)
Minimum 2,500 feet per car
to
Alpena, Mich.

| From | Rates per thousand feet | From | Rates per thousand feet |
|---|---|---|---|
| Alcona _____Mich. | $3 00 | Harrisville ____Mich. | $3 00 |
| Aloha_____ " | 3 25 | *Hurst (Hurst Branch) | |
| Au Sable_____ " | 3 25 | _____ Mich. | 3 00 |
| Black Lake Quarry | | La Rocque _____ " | 3 00 |
| (Black Lake Branch) | | *Le Grand _____ " | 3 25 |
| _____ Mich. | 3 25 | Lincoln _____ " | 3 25 |
| Black River___ " | 3 00 | *Martindale Spur | |
| Bolton _____ " | 3 00 | (Tubbs Branch) | |
| Bunton _____ " | 3 00 | _____ Mich. | 3 00 |
| Case _____ " | 3 25 | Metz_____ " | 3 00 |
| Cathro_____ " | 3 00 | Mikado_____ " | 3 25 |
| Cheboygan____ " | 3 25 | Millersburg_____ " | 3 25 |
| *Clark's Mill (Cleveland Branch) Mich. | 3 25 | *Mill Spur (Indian River Branch) Mich. | 3 25 |
| *End of Kimball Branch_____Mich. | 3 00 | Onaway_____ " | 3 25 |
| | | Ossineke _____ " | 3 00 |
| *End of Wolverine Branch_____Mich. | 3 25 | *Paxton _____ " | 2 50 |
| | | Polaski _____ " | 3 00 |
| *Gilchrist Spur (Laugh Branch)__ | | Posen _____ " | 3 00 |
| _____ Mich. | 3 25 | Tower _____ " | 3 25 |
| Greenbush_____ " | 3 25 | Waveland _____ " | 3 25 |
| Gustin____ ____ " | 3 25 | | |
| Handy____ ____ " | 3 25 | | |

The rates from intermediate points will be the same as the rates from the next more distant point from which rates are named:

---

*No regular train service. Shipments from these points handled at our convenience only.

171 MICH.—23.

A refund of 50 cents per thousand feet on logs will be made when an equal amount of manufactured product is shipped out via the Detroit & Mackinac Railway.

Issued, Jan. 20, 1909.                    Effective, Feb. 1, 1909.

M. R. C. No. 208 (Corrected).

G. F. D. No. 560 (Corrected).

Cancels M. R. C. No. 2.

Cancels G. F. D. No. 104.

Reissue—Reduction.

DETROIT & MACKINAC RAILWAY COMPANY.

"Turtle Route."

Local Freight Tariff on Bolts and Logs, all kinds, minimum weight on bolts 40,000 pounds per car between local stations on Detroit & Mackinac Railway.

| Distances (Note) not to exceed | Rate on bolts in cents per 100 lbs. | Rate on logs per 1,000 feet. | Minimum charge per car on logs. |
|---|---|---|---|
| 10 miles | 3–4 | $1.00 | $3.00 |
| 20 miles | 1 | 1.33 | 4.00 |
| 30 miles | 1 1–4 | 1.67 | 5.00 |
| 50 miles | 1 1–2 | 2.00 | 6.00 |
| 80 miles | 1 3–4 | 2.33 | 7.00 |
| 100 miles | 2 | 2.67 | 8.00 |
| 125 miles | 2 1–4 | 3.00 | 9.00 |
| 150 miles | 2 1–2 | 3.33 | 10.00 |

Note.—In arriving at correct distances this tariff is governed by Local Distance Table G. F. D. No. 565, M. R. C. No. 211 and supplements thereto and reissues thereof.

The rates named herein apply only when the manufactured product is to be reshipped via Detroit & Mackinac Ry. and in the absence of tariff naming specific rates.

Issued February 8, 1909. Taking effect February 20, 1909. Issued to supersede original tariff by authority Michigan Railroad Commission, file 11295, D. & M., Feb. 11, 1909.

The slightest study of these tariffs in connection with the statement of mileage heretofore made will disclose the considerable difference in the published rates. Take, for example, La Rocque, which would be reckoned as 30 miles distant from Alpena. Under M. R. C. 208, the minimum tariff for moving a car of logs to Alpena is $5; under M. R. C. 205, it is $7.50. If the logs transported were shipped out as lumber via complainant's road, the

refund would be, according to the tariff, 50 cents per thousand, or $1.25.

In the business done by the complainant in the year 1909, about 70 per cent. of the total earnings was received from freight.   About 52 per cent. of the total freight revenue came from transporting logs, lumber, and forest products.   All logs hauled to Alpena lumbermen were from points north of Alpena and south of Cheboygan. The accompanying table shows the number of cars of log shipments to Alpena for the year 1909, the point of shipment, the miles covered, the scale of the logs.   The total number of feet is admitted by intervening defendants to be correct:

| From | No. Cars. | Miles. | Feet. |
|---|---|---|---|
| Black River | 29 | 22.9 | 83,420 |
| Hillman | 17 | 23.9 | 53,988 |
| Paxton | 136 | 9 | 447,048 |
| Dagget's Xing | 11 | 10.5 | 33,870 |
| Bolton | 238 | 11.5 | 795,040 |
| Cathro | 104 | 9.2 | 326,810 |
| Kimball Br. | 985 | 19.9 | 3,004,720 |
| Crawford Spur | 389 | 15 | 1,178,605 |
| Buzza Spur | 45 | 18 | 136,140 |
| Polaski | 169 | 16 | 531,730 |
| Posen | 296 | 19 | 949,684 |
| Nowicki | 289 | 22.9 | 954,200 |
| Metz | 401 | 24 | 1,292,310 |
| Cedar Spur | 171 | 22 | 561,630 |
| So. Rogers | 224 | 25.6 | 731,030 |
| La Rocque | 1,126 | 28.8 | 3,616,262 |
| Hurst Br. | 168 | 33.8 | 546,510 |
| Millersburg | 9 | 37.6 | 27,270 |
| Bunton | 1 | 31.9 | 2,750 |
| Case | 4 | 42.1 | 11,220 |
| Onaway | 482 | 46.4 | 1,615,142 |
| Black Lake Br. | 10 | 52 | 35,615 |
| Tubbs Br. | 867 | 47.1 | 2,755,100 |
| Pritchard Sp. | 216 | 43 | 637,210 |
| Gilchrist Br. | 861 | 55.2 | 2,812,572 |
| Indian Riv. Ex. | 96 | 58.5 | 298,950 |
| Pollock Sp. | 244 | 55.2 | 796,730 |
| Bloom Br. | 573 | 56.5 | 1,845,030 |

| From | No. Cars. | Miles. | Feet. |
|---|---|---|---|
| Laugh Br. | 149 | 55.5 | 475,945 |
| Nicholson Sp. | 7 | | 22,250 |
| Wolverine Br. | 282 | 64 | 862,700 |
| Cleveland Br. | 164 | 61.8 | 525,425 |
| Tower | 22 | 50.3 | 66,825 |
| Aloha | 5 | 64 | 15,230 |
| Cheboygan | 11 | 73.7 | 34,240 |
| | 8,801 | | 28,083,201 |

It is charged in the bill of complaint, under a videlicit, that the property of the complainant, including investments in logging spurs and branches, is of the value of $4,585,000; that the cost of reproducing the same, less depreciation from age, wear, etc., would equal that sum; that the total revenue for the year ending June 30, 1909, was $1,164,848.86; that its operating and maintenance expenses, including taxes, were $881,389.52, leaving a net profit of $283,459.34, a little less than 6⅕ per cent.; that, if the orders of the Michigan railroad commission are enforced, the earning capacity of the capital investment will be seriously impaired and reduced below the reasonable and legitimate earnings of similar railroad property in the State of Michigan and in the United States of America, and to less than it is entitled to earn, before it can be required to perform any particular service for less than the cost thereof. It is charged that the effect of the tariff fixed by the commission will be to require it to perform the service indicated at less than cost and a fair profit.

The testimony of the general manager of the railway company is that, in his opinion, the physical property of the road can be reproduced in its present condition for a sum greater than $5,000,000 and less than $6,000,000, and that the road is worth as situated about $8,000,000. Its common stock is $2,000,000, preferred stock, $950,000, first lien bonds, $1,500,000, mortgage bonds, $1,600,000; total, $6,050,000.

In the treasury of the company are $800,000 of its bonds,

said to represent actual betterments of the road which have been paid for, for which betterments the bonds might have been sold, but were not. It appears that the outstanding bonds did not sell at par; that considerable permanent improvements have been made out of earnings; and that the cost of the branches, or of some of them, was charged to operating expenses. The property is valued for taxation by the State assessors at $4,485,000.

For the purposes of decision, the learned circuit judge assumed the value of the road to be $5,000,000. The basis of a calculation, such as the Michigan railroad commission was bound to make, has been many times held to be the fair value of the property as a producing factor, not necessarily its cost nor the amount of money expended. 4 Elliott on Railroads, § 1684*a*.

"The basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience." *Smyth* v. *Ames,* 169 U. S. 466, 546, 547 (18 Sup. Ct. 418).

See, also, 2 Hutchinson on Carriers, § 583.

We have stated the testimony upon the subject. We are of opinion that with the burden resting upon complainant it should have presented other evidence, from which the court could determine, with reasonable certainty, the value of property. If the value of the property is to rest upon opinion, the opinion of the commission

is quite as valuable as that of the court. The evidence before us entitled to the greatest weight is that of the assessed value of the property and the averments in the sworn bill of complaint. Evidence of a greater value, if it exists, is available to complainant.

Complainant has expended considerable sums in building and maintaining the branch roads. It is expensive to keep them open in the winter. The taxes exacted from railroads, including complainant, have been materially increased in late years. Complainant presented an estimate of the daily expense of handling eight cars of logs daily for an intervening defendant during the month of April, 1910, between Gilchrist Branch and Alpena, which is said to be a haul of 61 miles. That it is an impossibility to find the actual cost of such service is admitted. Without setting out the result of the examination which we have made of this estimate, our finding is that some of the items of expense are manifestly excessive.

In the last analysis of the testimony, the facts which appear to have the largest value for complainant are: (1) That the service rendered to Alpena lumbermen in accordance with M. R. C. 205 is in some respects special, since all, or nearly all, of the logs transported for them come out of the branches. (2) The timber, in the past and now the source of a large revenue, will in a few years be exhausted, and, unlike agricultural and manufactured products, it cannot be reproduced. (3) By far the largest portion of the logs carried to Alpena are made into lumber and shipped away by water; whereas, at one or more of the points to which the power rates apply, the considerable manufacture of logs into commodities other than lumber is carried on, prolonging the life of all business dependent upon the forest products, increasing the size and stability of the communities, and, in consequence, augmenting the revenue of the railroad which must bring to the communities what they need and cannot themselves supply. (4) In the past it has received for a service, such as that to which M. R. C. 205 applies, a rate equal to or

slightly less than the tariff rate. (5) The service now rendered by complainant to Alpena lumbermen is rendered at somewhat greater cost to complainant than formerly, owing to the manner of loading and delivery of logs and a generally increased cost of operating the road. (6) The large diminution of the earnings of the road under the commission tariff. (7) The situation and prospects of the railroad without feeders (except a single short road), with a local business, with short hauls.

The reasonableness of M. R. C. 205 is supported by experience, by which is meant the exacting by the railroad and payment by shippers, in the past, of a corresponding tariff. It is supported by the written request of one of the intervening defendants, hereinbefore set out, in which a rate is specified. It is supported by the fact that the branch lines are built, and when they were built it must have been mutually contemplated by the railroad company and the timber owners that, in the absence of any considerable change in circumstances, rates corresponding to those then existing would be demanded and paid. The railway company has had no opportunity to consent, or refuse, to build and operate branch lines for the returns promised under the commission tariff. Other considerations modify some of those just stated. The complainant had no competitor for the business offered. It operated the branch lines somewhat at its convenience. The cutting of the timber necessarily preceded agriculture and a permanent community. The Michigan Central Railroad, under identical conditions as to branch lines, has in force a tariff of rates lower than those given in M. R. C. 208. The country tributary to the road has other natural resources, the development of which is furnishing, and will continue to furnish, a large tonnage of freight of a low class. But the most convincing evidence of the unreasonableness of the canceled tariff is found in M. R. C. 208 and the operations thereunder. Precisely the same service, length of haul excepted, is rendered by complainant under these tariffs. Under each, logs are brought in from

the branch lines and delivered at destination on the main line. The quantity transported under the lesser rate is much smaller than that transported under the greater rate; but it is not shown that the lesser rate is unremunerative. The only reason given for the evident discrimination against Alpena (or in favor of interior points) which we think has force is the one that from other stations than Alpena all manufactured product must be transported by complainant. This condition is met by a differential fixed by complainant and continued by the commission.

The Michigan railroad commission found that the rates charged for the transportation of logs in carload lots to the city of Alpena are unjust, unreasonable, and excessive. It is said, in *Interstate Commerce Com'n* v. *Railway Co.*, 209 U. S. 108, 118 (28 Sup. Ct. 493, 496):

"It must be remembered that railroads are the private property of their owners; that while, from the public character of the work in which they are engaged, the public has the power to prescribe rules for securing faithful and efficient service and equality between shippers and communities, yet in no proper sense is the public a general manager. As said in *Interstate Commerce Com'n* v. *Railway Co.*, 168 U. S. 144, 172 [18 Sup. Ct. 45], quoting from the opinion of Circuit Judge Jackson, afterwards Mr. Justice Jackson of this court, in *Interstate Commerce Com'n* v. *Railroad Co.* [C. C.], 43 Fed. 37, 50:

" 'Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers, as they were at the common law, free to make special rates looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce and of their own situation and relation to it, and generally to manage their important interests upon the same principles which are regarded as sound and adopted in other trades and pursuits.'

"It follows that railroad companies may contract with shippers for a single transportation, or for successive transportations, subject, though it may be, to a change of

rates in the manner provided in the Interstate Commerce Act (*Armour Packing Co. v. United States* [209 U. S. 56, 28 Sup. Ct. 428]), and also that in fixing their own rates they may take into account competition with other carriers, provided only that the competition is genuine and not a pretense. *Interstate Commerce Com'n* v. *Railroad Co.,* 145 U. S. 263 [12 Sup. Ct. 844]; *Texas, etc., R. Co.* v. *Interstate Commerce Com'n,* 162 U. S. 197 [16 Sup. Ct. 666]; *Interstate Commerce Com'n* v. *Railway Co., supra; Louisville, etc., R. Co.* v. *Behlmer,* 175 U. S. 648 [20 Sup. Ct. 209]; *East Tennessee,etc., R. Co.* v. *Interstate Commerce Com'n,* 181 U. S. 1 [21 Sup. Ct. 516]; *Interstate Commerce Com'n* v. *Railroad Co.,* 190 U. S. 273 [23 Sup. Ct. 687].

"It must also be remembered that there is no presumption of wrong arising from a change of rate by a carrier. The presumption of honest intent and right conduct attends the action of carriers as well as it does the action of other corporations or individuals, in their transactions in life. Undoubtedly when rates are changed the carrier making the change must, when properly called upon, be able to give a good reason therefor; but the mere fact that a rate has been raised carries with it no presumption that it was not rightfully done. Those presumptions of good faith and integrity which have been recognized for ages as attending human action have not been overthrown by any legislation in respect to common carriers."

This doctrine may be approved without requiring us to overturn the action of the railroad commission. The Alpena shippers of logs and the Onaway shippers of logs are similarly circumstanced with respect to securing the delivery of logs at the respective destinations. It is conceded that the railway company can and should make a lower rate for the service rendered to the shippers when the product of the logs is reshipped by rail. Aside from this consideration, the shippers at each of these points stand, as to each other, upon the same footing, demanding and receiving the same service. The differential adopted by the railway company is its estimate of the value to it of the reshipment of manufactured logs. When the differential is applied, there is still a much higher rate on logs to Alpena than to Onaway; mileage being considered. We

have considered whether the remaining difference may be treated as a further differential in favor of the interior communities, warranted, not by the difference in cost of service rendered, but by the necessity for encouraging local manufacturers, stable communities, and securing a constant revenue for the railroad. The tariff M. R. C. 208 is not framed in accordance with such a theory, whatever its results would be. It is doubtful if a mileage basis tariff could be so framed. As has been stated, it is not shown that the lower rate is not remunerative. The complainant has not shown, to our satisfaction, that the finding that the specific rates for logs in car loads to Alpena are *per se* unreasonable and excessive ought to be disturbed.

We come now to the point most dwelt upon in argument, namely, that the result of the action of the commission will be such a reduction of the earnings of complainant that it will not receive a fair return upon the value of its property devoted to the public convenience. Notwithstanding the elaborate treatment which counsel have given the matter, it occurs to us to inquire whether the point can be determined. It is presented by counsel; but does the record purport to contain what should be examined before arriving at a conclusion? The income of complainant derived under the tariff in question is a very considerable portion of its total income. The income will be materially reduced if the order of the commission is sustained and all other tariffs are maintained. But complainant has numerous tariffs. Are some of them too low? Are all of them just and reasonable? It may be answered that they are not questioned by defendants. This is not a sufficient answer, in view of the burden resting upon complainant. The canceled tariff has been found to be unjust and unreasonable. We are unable to say that the finding was wrong. The substituted tariff is *prima facie* just and reasonable. We are unable to say that it is not. Should other rates be increased? *Steenerson* v. *Railway Co.*, 69 Minn. 353 (72 N. W. 713).

There is testimony showing a proposed general tariff, increasing rates, to take effect in August, 1910, but suspended by an agreement among Michigan carriers to suspend class rate tariffs until November 1, 1910.  Complainant computes that under the old rates it would have received for logs transported to Alpena, in 1909, $85,864, while under the commission rates it would receive for the same service $51,132.45.  It therefore asserts that its loss in revenue will be $34,731.55.  In this computation the commission's minimum rate is applied and contrasted with M. R. C. 205 at its maximum.  Under M. R. C. 205, a refund of 50 cents per thousand feet is provided for, when the product of the logs is reshipped by rail; and the commission's minimum is increased by the same amount, if the product is not shipped out by rail.  It is manifest, therefore, that the loss in revenue will not be $34,731.55. The computation includes logs shipped to the Fletcher Paper Company.  All of its paper is shipped out by rail. In the year 1909, other products of logs shipped out of Alpena by rail was equal to about 11,000,000 feet, which is more than 40 per cent. of the 28,083,201 feet shipped in. An accurate computation is impossible.  The circuit judge roughly estimated that 20 per cent. of the logs shipped into Alpena were shipped out by rail, the remainder by water, and the net loss $30,000.  The testimony given in terms of percentage most favorable to this finding is that from 75 to 80 per cent. was shipped by water.  Computing the difference in revenue upon the basis that 41 per cent. of logs was shipped out by rail, the difference between M. R. C. 205 and the commission rate would be $19,608.23. If all logs into Alpena in 1909 had been reshipped by rail, the revenue derived by complainant would have been $65,174.05.  Whatever the exact result may be, it is denominated by complainant a direct loss, as distinguished from the indirect loss arising from loss of business at the points favored by M. R. C. 208.

The general manager of complainant expressed the opinion that the putting into effect of the order of the commis-

sion "would hurt the railroad to an extent of over 10 per cent. of its gross earnings." It seems probable that if the commission's order had been in effect during 1909, the resulting loss of revenue would have been from $21,000 to $25,000. The net earnings of the road for 1909 were $283,459.34, and for 1910 were $296,586.45, according to the annual reports made by the complainant. A loss of revenue of $25,000 each year would have reduced net earnings to $258,459.34 in 1909, and to $271,586.45 in 1910. Valuing the property invested at $4,585,000, a 6 per cent. return thereon would be $275,100. Ought we to assume that the net earnings of the road, for the purposes of this case, are those reported and above set out? It appears that a sum equal to nearly one-half of the net earnings reported was in each of the years 1909 and 1910 charged off for depreciation. Should such sums have been so charged? Assuming that complainant is entitled to maintain tariffs which will yield a net return of 6 per cent. per annum, or more, upon the value of the property it devotes to the public use and convenience, has it fairly shown that it does not now get such a return? We are not disposed to enter upon a consideration of the question whether complainant is entitled to a net return of 5 or 6 or 7 per cent. upon its property; we are disposed to make it clear, with what may seem needless prolixity, that the margin between what complainant claims and what it admittedly receives is a small one, increasing and diminishing, as we indulge or do not indulge assumptions, and that the enforcement of an order reasonable in itself will not be forbidden, except upon clear proof that the result is and must be to deprive complainant of a fair return upon the value of its property.

3, 4. It appears that the complainant charges in Alpena three, four and five dollars per car for switching. Under what circumstances of time, place, and probable expense these various charges are imposed, we are not informed. We are not satisfied with—are very doubtful concerning —the estimate presented of the actual cost of switching

cars to Fletcher's Dam. We repeat that the rates made by the commission are *prima facie* reasonable and just. They must be shown to be unjust and unreasonable. Indulging the statute presumption, we are unwilling to hold that the rate prescribed by the commission is unreasonable. And with respect to the freight rate and delivery of cars to Fletcher's Dam, we express the affirmative opinion that the order made by the commission is, in view of all the circumstances, a just one.

The decree of the court below is affirmed, but without prejudice to the right of the railway company to move the commission for a modification of its rules, as its experience and the facts coming to its knowledge may appear to warrant.

MOORE, C. J., and STEERE, MCALVAY, BROOKE, and STONE, JJ., concurred. BLAIR and BIRD, JJ., did not sit.