No. 19,725.

THE UNION PACIFIC RAILROAD COMPANY, *Appellee*, v. THE PUBLIC UTILITIES COMMISSION OF THE STATE OF KANSAS, *Appellant*.

No. 19,726.

THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellee*, v. THE PUBLIC UTILITIES COMMISSION OF THE STATE OF KANSAS, *Appellant*.

SYLLABUS BY THE COURT.

1. INTRASTATE FREIGHT RATES—*Facts Considered in Determining whether Rates are Unprofitable.* Although tables of comparative freight rates may show that an intrastate coal rate fixed by the public utilities commission is extremely low, they can not be held to prove that the rate complained of is unprofitable when the same intrastate rates on the same commodity have been voluntarily established and long maintained by the carriers in other portions of the state.

2. SAME—*Rates Established by Utilities Commission Presumed to be Reasonable.* The burden is upon the carriers to overcome the presumption that the rates ordered established by the public utilities commission are reasonable.

Railroad Co. v. Utilities Commission.

3. SAME—*Railroad Entitled to Fair Profit on Each Commodity Transported.* The rule of law hitherto prevalent, that the rate on each and every commodity transported in intrastate commerce need not return a profit provided the entire intrastate business of the carrier shows a fair profit, must be abandoned in deference to the decision of the supreme court of the United States in *Nor. Pac. Ry. v. North Dakota,* 236 U. S. 585, 35 Sup. Ct. Rep. 429, decided March 8, 1915.

4. SAME—*"Unreasonable," "Unjust," "Oppressive" and "Unlawful"—Not Synonymous with "Confiscatory."* When a railroad carrier invokes a judicial review of rates imposed by the public utilities commission as provided by section 7228 of the General Statutes of 1909 and section 21 of chapter 238 of the Laws of 1911, the words "unreasonable, unjust, oppressive and unlawful" are not synonymous with "confiscatory," and should be given their fair and reasonable import according to the usages of courts of equity.

5. SAME. A rate is "unreasonable, unjust, oppressive and unlawful" as against the carrier if it does not fairly compensate the carrier for its services.

6. SAME—*Voluntary Rates Established by Railroads May be Taken as a Basis for Fixing Reasonable Rates.* It is proper for the public utilities commission in establishing coal rates between Pittsburg, Kan., and Concordia, Kan., on purely intrastate transportation, to use the voluntary intermediate rates established and long maintained by the carriers as a basis for fixing such rates.

7. SAME—*Rates on Slack, Nut and Pea Coal Fixed by Commission Not Unreasonable.* A rate on slack, nut and pea coal from Pittsburg, Kan., to Concordia, Kan., composed by adding the Kansas local distance rate of twenty cents per ton from Abilene to Concordia to the carrier's voluntary rate of $1 per ton from Pittsburg to Abilene, and involving only intrastate commerce, is not unreasonable, unjust or oppressive.

Appeal from Shawnee district court, division No. 1; ALSTON W. DANA, judge. Opinion filed May 8, 1915. Reversed.

*H. O. Caster,* of Oberlin, and *John Marshall,* of Topeka, for the appellant; *A. E. Helm,* of Wichita, of counsel.

*William R. Smith,* of Topeka, for appellee The Atchison, Topeka & Santa Fe Railway Company.

*R. W. Blair,* of Topeka, for appellee The Union Pacific Railroad Company.

*E. H. Hogueland,* of Topeka, for both appellees.

The opinion of the court was delivered by

DAWSON, J.: This is an appeal by the public utilities commission from a decision of the district court of Shawnee county in which the commission was enjoined from enforcing its order directing the Santa Fe and Union Pacific railroads to reduce their freight rates on slack, nut and pea coal from Pittsburg to Concordia from $1.54 per ton to $1.20 per ton.

About January 1, 1913, the Concordia Ice & Cold Storage Company and the Concordia Electric Light Company filed a complaint before the public utilities commission against the Santa Fe, Burlington, Missouri Pacific and Union Pacific railroads, charging that these carriers were exacting excessive and inequitable freight rates on coal from Pittsburg, Weir City and other shipping points in the coal district of southeastern Kansas to Concordia; that the rate exacted on slack, nut and pea coal from that district to Concordia was $1.54 per ton, while Kanopolis, Ellsworth and Salina, which were equally remote from said coal district, enjoyed a rate of $1 per ton, and that the latter rate was a just recompense for the service of transportation. The Concordia complainants prayed for a reduction of rates to $1 per ton.

On July 3, 1913, the public utilities commission made the following order:

"The application in this case alleges that the complainant is engaged in manufacturing ice and in maintaining a cold storage plant in the city of Concordia, Cloud county, Kansas. Complainants further allege that the coal they use in manufacturing their ice and in running their cold storage plant comes from what is known as the Pittsburg district, and that the rate made by the respondent on this coal to Concordia is higher, both relatively and absolutely, than the rate

made on like kind of coal to other towns with which complainants compete.

"The respondents at the hearing were not inclined to deny that the rate on the particular grade of coal used by the complainants is more favorable to certain other towns in the neighborhood of Concordia than it is to Concordia, but they represent that what they call the dollar rate on slack and other cheap grades of coal from the Pittsburg district was made a number of years ago for the benefit of the salt industry and was extended only to the salt towns, or the towns through which coal must be hauled on its way to salt towns, known as intermediate towns. They further represent that this rate which they call the salt rate, or the dollar rate, is unreasonably low and can be justified, if at all, only on the ground that it encourages the salt industry and gives the carriers a return haul.

"The answer is only partly good. The evidence shows that the average rate for hauling these several kinds of coal to non-salt-producing towns is 4.8 mills per ton mile, while the rate to Concordia is 5.6 mills per ton mile. Abilene is intermediate between Pittsburg, Kan., and some of the salt towns. It is also intermediate between Pittsburg and Concordia. The rate from Pittsburg district to Abilene, a distance of 220 miles, is $1. Concordia is fifty-five (55) miles beyond Abilene in making the haul from Pittsburg, and the rate from Abilene to Concordia is 54 cents. The coal is hauled to Abilene for 3.8 mills per ton mile and from Abilene to Concordia at practically one cent (1 cent) per ton mile. We think that these facts justify a reduction. The complainants ask for a rate of $1.20 on the above-mentioned coals from Pittsburg district to Concordia, where the haul is wholly within the state of Kansas, and we are of the opinion that they are entitled to that rate.

"It is therefore ordered, that the respondents herein publish and put in effect, within thirty days from the date hereof, a rate of not exceeding $1.20 on slack, nut and pea coal in carload lots, from the Pittsburg district to Concordia, Kansas, when such shipments of coal are transported wholly within the state of Kansas."

Within thirty days the appellees filed suits in the district court of Shawnee county against the public

utilities commission, setting up the pertinent facts, and alleging that the order of the commission was unlawful, unreasonable and void; that the rate ordered was unremunerative and confiscatory; that it would result in taking the carriers' properties without due process of law and deprive them of the equal protection of the law assured them by the fourteenth amendment; that the rate ordered was so unreasonably low that it would cause a disturbance in settled coal rates and would require a readjustment of interstate coal rates in order that other mine operators in adjoining states might compete with the mines of the Pittsburg district favored by such order, and that the order would affect, regulate and control interstate rates. The Union Pacific also alleged that its lines did not reach the coal fields of the Pittsburg district, and that all such coal conveyed by it would have to be transported over one or more other railroads, and that the rate was unreasonably low when applied to a two-line or more-than-two-line haul. The Union Pacific has never recognized the one-dollar rate under discussion. Its joint rate from the coal district to the salt district at Kanopolis is $1.25, but it probably gets little of the traffic.

The appellees promptly secured a temporary injunction against the enforcement of the reduced rate, and upon final hearing the court made findings of fact and conclusions of law and set aside the order reducing the rates, and perpetually enjoined the commission from enforcing it. The commission appeals, and argues the following propositions: (1) That the evidence does not show that at the rate of $1.20 this coal would not be carried at a profit. (2) That the presumption is that the rate fixed by the commission is reasonable, and the railroads have the burden of showing the contrary. (3) That the coal rate in controversy need not in itself be compensatory if the earnings of the carriers on their entire intrastate business are profitable; and that before the district court can say that the rate is unrea-

sonable the railroads must show that a compliance with
the order would reduce their entire net earnings on
their intrastate business to such an extent as to con-
stitute a taking of their property without just com-
pensation and without due process of law. (4) That
the commission was justified. in taking the carriers'
voluntary rates between the Pittsburg coal district and
the Hutchinson-Kanopolis salt district as a basis for
fixing rates to other points than those between those
districts.

To these questions the railroads add some others:
(5) That the words "unreasonable" and "unlawful"
in the Kansas statute are not synonymous with "con-
fiscatory," and that the statute intends that the judicial
review .of rates established by the commission shall test
the reasonableness and justice of the rates according to
equitable principles. (6) That the rate of $1.20 per
ton from the Pittsburg district to Concordia is un-
reasonable when measured by the ordinary tests em-
ployed by the interstate commerce commission and by
other state commissions. (7) That the ordinary rule
of this court not to disturb findings of fact of the trial
court when they are supported by competent evidence
should be followed in this class of cases as in all others.

The importance of this case lies in the principles
involved. Coal is extensively mined in Crawford and
Cherokee counties in southeastern Kansas in what is
commonly called the Pittsburg district. Salt is pro-
duced in limitless quantities in Reno and Ellsworth
counties and thereabout. Some years ago the railroads,
after consultation with the state board of railroad com-
missioners, predecessor of the public utilities commis-
sion, but without any formal order of that board, estab-
lished a rate of $1 per ton on slack, nut and pea coal
from all points in the Pittsburg coal district to Hutch-
inson and all other points in the salt-producing dis-
trict. The production, transportation and delivery of
this coal are entirely Kansas domestic commerce and

39—95 KAN.

the complications which so frequently arise on account of interstate commerce are almost wholly absent.

This rate of $1 is said to be an unusually low rate and was voluntarily established by the carriers for the purpose of fostering the salt industry, it being then generally understood that 95 per cent of the cost of producing salt was for fuel. All stations between the coal district and the salt district enjoy the dollar rate. Abilene is one of the intermediate towns, and Concordia is located fifty-six miles north of Abilene.

The Pittsburg-Concordia rate of $1.20 per ton, which is the subject of this lawsuit, was made by adding to the Abilene rate a proportional of twenty cents as per the Kansas local distance tariff. The question comes then to this point: Was the dollar rate to Abilene, an intermediate town between the coal district and the salt district, a fair basis upon which to establish a rate from the coal district to Concordia, a town not intermediate between the coal and salt districts?

The evidence shows that the dollar rate was established by the railroads after a conference between the railway representatives and the salt producers, called at the instigation of the state board of railroad commissioners in 1906, upon a tacit agreement with the state commission that this dollar rate would not be used as a basis for the fixing of coal rates to other points. No order was made and no record of this conference was made by the commission, but the fact is credible and not disputed. Its legal effect is debatable. The statute of 1905 says no rates shall be changed without an *order* of the state commission and that emergency rates shall only be for a limited time. (Laws 1905, ch. 340, § 13, Gen. Stat. 1909, § 7178.) However, it is doubtful if this agreement can be taken into account, and it may be doubted whether the commission had the power to make it. It is doubtful if the agreement is in harmony with public policy. The commission could *order* what was proper, and its agreement or acquiescence in anything improper or illegal

would be without force and void. It is indeed doubtful if upon any ground an unduly low or preferential rate can be permitted under existing law. It takes just so much money to operate a railroad and maintain the property against depreciation. That far the public is interested. Then the owners of the property are entitled to a fair profit on their investment if the property has been wisely located and prudently managed. How can these results be attained if some traffic is transported at an unduly low rate? Only by the exaction of an unduly high rate on other traffic. Our statutes provide that every freight rate must be reasonable and just (Gen. Stat. 1909, § 7170) ; that no form of preference, privilege or discrimination shall be permitted (Gen. Stat. 1909, § 7181). It is also provided that railroads shall charge the same rate to all persons for like services under substantially similar conditions. (See Gen. Stat. 1909, § 7196.)

Section 7214 of the General Statutes of 1909 reads:

"No railroad company shall charge, demand or receive from any person, company or corporation, for the transportation of any property, or for any other service, a greater or less sum than it shall at the same time charge, demand or receive from any other person, company or corporation for a like service from the same place, or upon like conditions and under similar circumstances; and all concession of rates, drawbacks and contracts for special rates shall be open to and allowed all persons, companies and corporations alike; nor shall it charge more for transporting freight from any point on its line than a fair and just proportion of the price it charges for the same kind of freight transported from any other point; nor shall it be lawful to charge a greater freight-rate to haul any class of goods for a shorter distance than for a longer one in the same general direction under like conditions, and over the same system of road in Kansas, except by the consent of the commissioners."

Section 10 of chapter 238 of the Laws of 1911 (the public utilities act) in part reads:

"And every unjust or unreasonable discriminatory or unduly preferential rule or regulation, classification,

rate, joint rate, fare, toll or charge demanded, exacted or received is prohibited and hereby declared to be unlawful and void."

Section 13 provides:

"If after full hearing and investigation the commission shall find that such rates, joint rates, fares, tolls, charges or exactions, classifications or schedules of rates or joint rates, or rules and regulations, are unjust, unreasonable, unjustly discriminatory or unduly preferential, the commission shall have power to fix and order substituted therefor such rate or rates, fares, tolls, charges, exactions, classifications or schedules of rates or joint rates and such rules and regulations as shall be just and reasonable."

Again, in section 16 it is said:

"If upon such hearing and investigation the rates, joint rates, fares, tolls, charges, rules, regulations, classifications, or schedules of such common carrier or public utility governed by the provisions of this act, are found to be unjust, unreasonable, unfair, unjustly discriminatory or unduly preferential, or in any wise in violation of the provisions of this act, or of any of the laws of the state of Kansas, the public utilities commission shall have the power to fix and establish, and to order substituted therefor, such rates, joint rates, fares, tolls, charges, rules, regulations, classifications or schedules as it shall find, determine or decree to be just, reasonable and necessary; and if it shall be found that any regulation, practice or act whatsoever, relating to any service performed or to be performed by such public utility or common carrier for the public in any respect unreasonable, unjust, unfair, unreasonably inefficient, insufficient, unjustly discriminatory or unduly preferential, or otherwise in violation of any of the provisions of this act, or of any of the laws of the state of Kansas, the public utilities commission shall have full power, authority and jurisdiction to substitute therefor such other regulations, practice, service or act as they find and determine to be just, reasonable and necessary."

Here also we should cite section 17 of article 2 of the state constitution, which provides that all laws of a general nature shall have uniform operation through-

out the state, for the question will press itself upon us throughout this case as to the justification of any law, or rule of any board founded on any law, which would permit one section of the state to enjoy preferential or favored freight rates over another section of the state. In other words, can we justify freight rates from Pittsburg to the salt district and intermediate points which are less than the freight rates from Pittsburg to Concordia and other points not intermediate?

It goes without saying that favorable freight rates have a very pronounced effect upon any territory thus favored, whether these rates are justified by natural causes, by artificial competitive conditions, or by unfair discrimination; and unfavorable rates have the effect of depressing and discouraging commercial and industrial progress. We may properly take judicial notice of the fact that west of the cities on the Missouri river and north of Topeka and Salina our state has scarcely a commercial or industrial center. On the other hand, these two cities and Pittsburg, Coffeyville, Wichita and Hutchinson and others in the southern half of the state manifest a steady growth not only in population but in the extent and variety of their commercial and industrial activities. Some of this growth may be attributed to natural resources and some to advantageous location in railroad centers, but these alone do not altogether explain the disparity of development between the cities of northern and southern Kansas. These are not problems for the courts but they certainly are for Kansas statesmen, and especially for those clothed with direct official responsibility like the members of the public utilities commission. History records that to carry out a far-visioned project for the normal and indiscriminate development of Texas, a distinguished statesman of that commonwealth, Senator John H. Reagan, resigned his seat in the United States senate to become the chairman of the state board of railroad commissioners of that state, and under his leadership that

commission deliberately promulgated a system of freight rates which tended to develop a large number of commercial centers rather than to permit one abnormal city like St. Louis or Chicago to dominate the entire commerce of the state.

And we are bound to believe that some such comprehensive vision of the needs of this state and a desire to secure a wise and indiscriminate development of all portions of our commonwealth prompted the appellant commission to use the voluntary rate between the coal and salt districts of this state as the basis upon which to build a rate structure to Concordia. The courts have no rate-making powers; the legislature can not confer such powers upon us, and we must steadfastly refrain from the assumption of such powers. When our jurisdiction is invoked in any railroad rate case, our duties are limited to a determination of legal questions. Do the rates return a fair compensation as constitutions provide and as statutes contemplate? Are the rates reasonable? Are they discriminatory? Are they extortionate? Questions like these we must consider and determine. As said by Mr. Justice Hughes in *The Minnesota Rate Cases,* 230 U. S. 352, 57 L. Ed. 1511:

"The rate-making power is a legislative power and necessarily implies a range of legislative discretion. We do not sit as a board of revision to substitute our judgment for that of the legislature or of the commission lawfully constituted by it, as to matters within the province of either. (*San Diego Land & Town Co. v. Jasper,* 189 U S. 439, 446, 47 L. Ed. 892, 896, 23 Sup. Ct. Rep. 571.)" (p. 433.)

In *The State v. Railway Co.,* 76 Kan. 467, 92 Pac. 606, it was said:

"There is nothing substantial in the contention that the statute authorizes the court to try the whole controversy and make such orders as it may deem reasonable and just, and that the order when reviewed and revised becomes a judicial order. This court is not given authority by the act to make any rule, order or regulation.

"Its authority is limited to the inquiry whether the order already issued is reasonable and just." (p. 486.)

Touching the jurisdiction and power of the courts in railroad rate questions, our statutes say:

"Issues shall be formed and the controversy tried and determined as in other civil cases of an equitable nature; and the court may set aside, vacate or annul one or more or any part of any of the regulations or orders adopted by the said board which shall be found to be unreasonable, unjust, oppressive or unlawful, without disturbing others; . . . Either party to said cause if dissatisfied with the judgment or decree of said court, may institute proceedings in error in the supreme court as in other civil cases, and said court shall examine the record, including the evidence, and render such judgment as shall be just and proper in the premises." (Gen. Stat. 1909, § 7228.)

It will be noted that the judicial consideration of a freight-rate case shall be tried and determined like a case in equity, and that unreasonable, unjust, oppressive or unlawful rates may be annulled. Without any statute, a Kansas district court, holding as it does almost the full judicial power of this state both at law and in equity, could prevent the imposition of any such improper rates; and if compliance with "unreasonable, unjust, oppressive or unlawful" rates was sought by mandamus, this court or the district court would withhold judicial assistance to their imposition.

With these preliminary observations, let us note the questions raised by appellant.

(1 and 4)    The evidence tends to show that the rate ordered by the commission, $1.20 per ton, seems rather low. The average cost of freight traffic is 5 mills per ton per mile. The general average cost for the Santa Fe system from Chicago to California and Texas is 5.03 mills per ton per mile. The cost of handling all Kansas freight traffic on the Santa Fe is 5.38 mills per ton per mile. The present Pittsburg-Concordia rate of $1.54 is 5.6 mills per ton per mile. The $1.20 rate

would yield only 4.4 mills per ton per mile. We use the Santa Fe figures rather than the Union Pacific as the former has the short-line mileage. On the Santa Fe system the rates on bituminous coal for the year 1913 produced 6.44 mills per ton per mile. In making rates for slack, nut and pea coal, the custom is to fix them at eighty per cent of bituminous coal rates.

Elaborate tables are furnished us showing coal rates to many points equidistant from Pittsburg, and the $1.54 rate is not unfavorable to Concordia, except when compared with the dollar rate between the coal and salt districts.

To be of much value, tables of rates in Missouri, Iowa and Illinois should show the relative density of traffic. We might indulge the presumption that density of traffic in Nebraska and Oklahoma is much similar to our own. But measured by comparative rates, a common practice of the interstate commerce commission and the several state commissions, the proposed rate to Concordia is decidedly low. Whether it is possible to segregate this traffic from the general business of the carriers and demonstrate to a mathematical certainty that it is noncompensatory we can not say. No method of determining that fact is suggested by counsel for either side, and our own investigations have discovered no such determinant.

But we can not get away from the voluntary rates in vogue over a large part of Kansas, arising from the dollar rate between Pittsburg and the salt district. The concluding clause of section 7214 of the General Statutes of 1909 intimates that to save or foster a languishing industry an order of the commission might be made providing a rate to the salt district which need not have been applied to towns intermediate. But no languishing industry impelled the rate to Abilene and several hundred other points between Pittsburg and the salt district. Yet the Abilene rate and similar rates give a very low compensation per ton per mile. The

established rate to Abilene gives only 3.8 mills per ton per mile, as found by the public utilities commission. By the exhibits and tables submitted to us it appears to be 4.6 mills per ton per mile, as compared with 5.6 mills to Concordia. There is a general principle in rate-making that on shipments over long distances under similar conditions the longer the haul the lower the rate per ton per mile should be. This principle is violated in the rate of $1.54 per ton to Concordia, if it be just to test that rate by the rate to Abilene and other intermediate rates between Pittsburg and the salt district.

(2) It is true that there is a presumption of validity and reasonableness which attends the orders of the commission, and the railroads must carry the burden of showing that they are not just or reasonable. How can the railroads show in dollars and cents whether this rate, or any rate on any one commodity, is just, reasonable or fairly profitable? Can the items of cost, the wear and tear of tracks, engines and cars, the time and wages of employees, the myriad individual items of expense which enter into the movement of slack coal, be segregated from the general expenses of moving all traffic? It may not be impossible, but human skill has not yet achieved that result. Thus far in American judicial and administrative jurisprudence, railroad rate-making and costs of moving specific commodities are but guesses and estimates based upon averages, experiments and tests in operation. If a railroad must show absolutely in figures of arithmetic that a rate is unprofitable, then no rate on one specific commodity can ever be proven to be either profitable or unprofitable. The best the railroad can ordinarily do is to produce tables of prevailing rates on other not dissimilar commodities under approximately similar conditions. But the question would still remain as to whether or not all the comparative rates were fair and just or unfair and excessive. In practice before state commissions and before the interstate commerce commission,

and even before the courts, opinion evidence is received, but its value is not great. It is admissible only because no other and better evidence is in existence.

(3) It is urged for appellant that it is not necessary that this particular traffic be compensatory if the carrier's entire state business shows a fair profit, and that before the carriers can complain that the $1.20 rate ordered by the commission is unlawful it must be shown that it has depreciated their net earnings on all their Kansas business so as to wipe out all the profit on their entire business. Appellant's brief quotes ample authorities to sustain that contention, and we concede that that doctrine heretofore has been avowed by the highest courts. But right lately have come three decisions from the supreme court of the United States which disavow that doctrine and say that their prior decisions which are said to have sanctioned that view were never so intended, and that fairly read they never furnished a basis for that doctrine.

The cases just decided are *Nor. Pac. Ry. v. North Dakota,* 236 U. S. 585, 35 Sup. Ct. Rep. 429, *Minn. St. Paul &c. Ry. v. North Dakota,* 236 U. S. 585, 35 Sup. Ct. Rep. 429, and *Norf. & West. Ry. v. West Virginia,* 236 U. S. 605, 35 Sup. Ct. Rep. 437, all decided March 8, 1915. In the first of these, Mr. Justice Hughes said:

"Frequently, attacks upon state rates have raised the question as to the profitableness of the entire intrastate business under the state's requirements. But the decisions in this class of cases (which we have cited in the margin) furnish no ground for saying that the state may set apart a commodity or a special class of traffic and impose upon it any rate it pleases, provided only that the return from the entire intrastate business is adequate." (p. 599.)

The great significance of these decisions can be seen by noting the cases which the court had in mind where it speaks of those cited in the margin. They are: *Railroad Commission Cases,* 116 U. S. 307; *Dow v.*

*Beidelman,* 125 U. S. 680, 690; *Chicago &c. Railway Co. v. Wellman,* 143 U. S. 339, 341; *Reagan v. Farmers' Loan & Trust Co.,* 154 U. S. 362; *Covington &c. Turnpike Co. v. Sandford,* 164 U. S. 578; *Smyth v. Ames,* 169 U. S. 466; s. c., 171 U. S. 361; *San Diego Land Company v. National City,* 174 U. S. 739; *Chicago, Milwaukee &c. R'y v. Tompkins,* 176 U. S. 167; *San Diego Land & Town Co. v. Jasper,* 189 U. S. 439; *Stanislaus County v. San Joaquin C. & I. Co.,* 192 U. S. 201; *Knoxville v. Water Co.,* 212 U. S. 1; *Willcox v. Consolidated Gas Co.,* 212 U. S. 19; *Cedar Rapids Gas Co. v. Cedar Rapids,* 223 U. S. 655; *Louisville v. Cumberland Tel. & Tel. Co.,* 225 U. S. 430; *The Minnesota Rate Cases,* 230 U. S. 352, 433; *Missouri Rate Cases,* 230 U. S. 474, 497; *Southern Pacific Co. v. Campbell,* 230 U. S. 537; *Allen v. St. Louis, Iron Mt. & S. Ry.,* 230 U. S. 553, 556.

It is too soon to say how far-reaching these recent decisions may be. Presumably the new doctrine, if we persist in calling it a new doctrine, has probably come to stay. It is controlling, no doubt, and whatever has been said in decisions and textbooks to the effect that a state or a state commission could establish a rate not in itself compensatory provided the mass of state rates was profitable may as well be discarded. This applies to *St. L. & San Francisco Railway v. Gill,* 156 U. S. 649, 39 L. Ed. 567, where the supreme court of the United States said:

"As to whether a state law fixing the rates of fares requires a railroad to do business at a loss and therefore constitutes a taking of its property without just compensation or due process of law, the correct test is the effect of the law on the entire line of such railroad." (39 L. Ed. 567, headnote; ¶ 3.)

The new doctrine also discredits the case of *Minneapolis & St. Louis R'd Co. v. Minnesota,* 186 U. S. 257, 46 L. Ed. 1151, where it was held:

"A tariff fixed by the Commission for coal in carload lots is not proved to be unreasonable, by showing

that if such tariff were applied to *all* freight the road would not pay its operating expenses, since it might well be that the existing rates upon other merchandise, which were not disturbed by the Commission, might be sufficient to earn a large profit to the company, though it might earn little or nothing upon coal in carload lots." (Headnote.)

We do not say that these cases are overruled because the supreme court says that these decisions never were intended to sanction this doctrine which lawyers, courts and commissions have inferred from them.

(5) There is, however, much merit to the contention of the carriers in the case at bar that the word "unreasonable" is not synonymous with "confiscatory"; and this is supported by noting that the judicial review of an order of the commission shall be determined according to equitable principles. A rate may not be confiscatory, that is, it may not be so low as to amount to a taking of the carrier's property, its transportation, without due process of law or without just compensation, and yet be inequitable in that it does not yield a fair compensation, which would include cost of moving the traffic, wear and tear of tracks and equipment and a fair profit for the service rendered. This is the view of the Texas courts on a statute much like our own. (Rev. Stat. of Tex., 1895, art. 4565.)

In *Railroad Commission v. H. and T. C. Ry. Co.,* 90 Tex. 340, 38 S. W. 751, it was said: .

"In actions instituted under articles 4565 and 4566 Rev. Stats., to determine whether regulations adopted by the Railroad Commission are unreasonable and unjust, the test of reasonableness is not in a consideration of the question whether such regulation amounts to a taking of property without proper compensation,—such test being only applicable in determining the constitutionality of the law. The reasonableness and justice of the regulation is to be determined by the same rules as if it were an issue in other classes of suits, except as to the conclusive character of the evidence required." (Syl. ¶ 6.)

Railroad Co. v. Utilities Commission.

"It is asserted that, prior to the enactment of this law, the words 'unreasonable and unjust' when used in reference to the action of legislative bodies and of commissions created by them, had received the interpretation that such acts must be unreasonable and unjust to the extent of being violative of the constitution, and that the words 'unreasonable and unjust' must be so construed, because it will be presumed that the legislature used them in that sense. We know of no decision of any court which has defined either 'unreasonable' or 'unjust' to mean that the act so characterized is the taking of property without proper compensation, or without due process of law." (p. 353.)

In *Detroit, etc., R. Co. v. Railroad Com'n*, 171 Mich. 335, 137 N. W. 329, 333, it was held:

"We apprehend that the words 'reasonable and just' in the statute do not mean nonconfiscatory, as the word 'confiscatory' is usually defined. The legislature has not fixed the freight rates to be charged by complainant beyond this: It has prohibited and made unlawful every unjust and unreasonable charge. It permits reasonable and just rates to be charged for services performed. It has confided to the Michigan Railroad Commission the power, with the duty, to ascertain, in proper cases, whether a rate is reasonable and just or unreasonable and unjust, and to thereupon make an order in conformity with the facts. The facts being found, it is the legislature which speaks, approvingly or disapprovingly, as the case may be. The important business of the Commission with respect to rates is ascertaining facts. Its findings are not conclusive, but have the effect of establishing *prima facie* that the rates considered are reasonable and just and therefore lawful, or are unreasonable and unjust and unlawful. Its orders stand until modified or set aside by it or by the courts. The duty of the courts in the premises is not essentially different from that of the Commission." (p. 346.)

The cases of *Louisiana Ry. & Navigation Co. v. Railroad Commission*, 131 La. 387, 59 South. 820, and *M. St. P. & S. S. M. R. Co. v. Railroad Commission*, 136 Wis. 146, 116 N. W. 905, 912, are to the same effect.

And construing our own statute, we have no hesitancy in saying that the words "unreasonable, unjust, oppressive and unlawful" as applied to the orders of the commission must be given their fair and usual meaning, according to equity and good conscience, and that rates may be unjust and unreasonable to the detriment of either the carrier or the shipper without actually trenching upon the positive inhibitions of either the state or federal constitutions.

(7) But what shall we say as to the last contention of the carriers, that the ordinary rule of this court not to disturb findings of fact of the trial court should be observed in freight-rate cases as in all others? (*Railroad Commissioners v. Railway Co.*, 71 Kan. 193, 80 Pac. 53.) That rule is a wise one for most cases. The trial court sees the witnesses, observes their apparent frankness, candor and intelligence or lack of these qualities; frequently the trial court knows the witnesses and knows what credence to give their testimony. In these respects it has a great advantage over the supreme court which must glean its facts from the pages of a record. Moreover, the supreme court is for most purposes an appellate court for the review of errors. Its appellate jurisdiction is fixed by law. But these freight-rate cases usually involve mixed questions of law and fact, and to properly solve them we must frequently look below the so-called findings of fact developed by the trial courts. This also seems imperative in view of the controlling decisions of the United States supreme court. That tribunal has said:

"This court will review the finding of facts by a State court (1) where a Federal right has been denied as the result of a finding shown by the record to be without evidence to support it, and (2) where a conclusion of law as to a Federal right and findings of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts. (*Kansas City Southern Ry. Co. v. Albers Commission Co.*, 223 U. S. 573, 591; *Creswill v. Knights of Pythias*, 225 U. S. 246, 261; *Wood v. Chesborough*, 228 U. S. 672,

678.)   But the present case is not within either branch
of the rule.   (*Portland Ry. v. Oregon Railroad Com-
mission,* 229 U. S. 397, 412; *Miedreich v. Lauenstein,*
232 U. S. 236, 243, 244.) ".  (*Nor. Pac. Ry. v. North
Dakota,* 236 U. S. 585, 593.)

Another distinction must be noted which distin-
guishes freight-rate cases from most others.  Ordinarily
the facts are established in the district court for the
first time.   In freight-rate cases the facts are first de-
veloped and established before the public utilities com-
mission.   That body is equipped with statisticians, ac-
countants, engineers and other assistants.   The com-
missioners live in an atmosphere where freight rates
are studied, debated and discussed the whole year
round.   When its orders come up for review in the
courts, the time for presentation and consideration is
limited by the myriad of other cases involving every
other branch of the law, and the substitution of the
court's judgment for the judgment of the commission
ought not to be lightly undertaken.   Even in ordinary
jury cases, where the jurymen bring untrained minds
to the solution of questions of fact, neither the trial
court nor this court will trench upon the province of
the jury. With still greater reluctance should the courts
interfere with findings of fact made by a commission
chosen and trained for the purpose of solving such in-
tricate facts as usually lie at the basis of a structure
of freight rates.

But in the case before us, we do not need to disturb
any mere question of fact determined by the district
court.   The historical incidents relating to the estab-
lishment of the one dollar rate, the geographical facts
relating to the coal and salt districts, the arithmetical
and statistical facts and figures concerning rates and
tables of comparative rates as found and approved by
the district court are not disputed by either party.   The
conclusion that the one dollar and twenty cent rate
from Pittsburg to Concordia is unreasonable is not a
mere finding of fact but a mixed question of law and

fact, and all such questions are subject to appeal and review. Moreover, our statute seems to indicate that even where an order of the commission is under review in the district court, an original proceeding may be commenced in this court, and the proceedings in the district court may be stayed.

"Whenever a proceeding brought in the supreme court under section 38 of this act by the attorney for the board, or the attorney-general, upon the direction of the board of railroad commissioners against any railroad company to compel the compliance with any order of said board of railroad commissioners, shall be pending at the same time with an action brought in any district court of the state by such railroad company to vacate such order, the supreme court, upon such fact being made to appear, may stay all proceedings in said district court in said cause, so far as relates to the subject-matter involved in such proceeding in the supreme court, until the final determination thereof by the supreme court; and if said proceeding in the supreme court result in a final decision upon the merits, determining the question of the validity of such order, said district court, upon the facts being made to appear, shall render judgment in accordance with such decision of the supreme court." (Gen. Stat. 1909, § 7228.)

We have frankly conceded that the one dollar and twenty cent rate is very low. We can not say that it is noncompensatory, nor even that it is unprofitable. We do not determine that point. We leave that matter open. We do say that so long as the intermediate rates between the coal district and the salt district stand at $1 per ton, that intermediate rate of $1 is a fair, just and proper factor in composing a freight rate from Pittsburg to Concordia, and that the order of the commission based thereon is reasonable and just and should be observed and obeyed so long as the one dollar rate to Abilene and similar intermediate points is maintained. This is in accord with the views of the supreme court of the United States in *Alabama &c Ry. v. Missis-*

Railroad Co. v. Utilities Commission.

*sippi R. R. Comm.*, 203 U. S. 496, 51 L. Ed. 291, where
Mr. Justice Brewer said:

"While it may be true that a local railway's share
of an interstate rate may not be a legitimate basis upon
which a state railroad commission can establish and
enforce a purely local rate, yet, whenever, under the
guise or pretense of a rebilling rate, some merchants
are given a low local rate, the commission is justified
in making that rate the rate for all. It is not bound to
inquire whether it furnishes adequate return to the
railway company, for the state may insist upon equal-
ity, to be enforced under the same conditions against
all who perform a public or quasi public service. When
voluntarily the Vicksburg company established a local
rate of 3½ per cent from Vicksburg to Meridian for
those who had, within ninety days, made a shipment
over the Shreveport road, it estopped itself from com-
plaining of an order making that rate applicable to all
shipments, no matter whence they arose, and in favor
of all merchants, whether those transporting over the
Shreveport road or not. . . . In the present case we
are not construing an act of the state of Mississippi or
passing upon the powers which by it are given to the
state railroad commission. Those matters are settled
by the decision of the supreme court of the state, and
the question we have to consider is the power of the
state to enforce an equality of local rates as between
all parties shipping for the same distance over the same
road. That a state has such power cannot be doubted,
and it cannot be thwarted by any action of a railroad
company which does not involve an actual interstate
shipment, although done with a view of promoting the
business interests of the company. Even if a state may
not compel a railroad company to do business at a loss,
and conceding that a railroad company may insist, as
against the power of the state, upon the right to estab-
lish such rates as will afford reasonable compensation
for the services rendered, yet, when it voluntarily es-
tablishes local rates for some shippers, it cannot resist
the power of the state to enforce the same rates for all.
The state may insist upon equality as between all its
citizens, and that equality cannot be defeated in re-
spect to any local shipments by arrangements made
with or to favor outside companies." (pp. 500, 501.)

40—95 KAN.

An instructive case in this connection is *Railroad Commission of La. v. St. L. S. W. Ry. Co.,* 23 I. C. C. 31. Briefly stated, the intrastate freight rates in Texas were lower than the interstate rates. As a consequence the wholesale jobbing town of Shreveport, La., was at a disadvantage in reaching the trade territory of eastern Texas. Its competitors, Dallas, Houston, and other Texas jobbing towns, enjoying the lower intrastate rates, had all the better of it. The interstate commerce commission held in substance that the rates from Shreveport would have to be reduced; that if the Texas rates were not compensatory, the railroads need not observe them; but since the railroads did observe them in intrastate traffic in eastern Texas, it must grant Shreveport rates no higher than those in interstate transportation to points in the same general territory.

This order of the commission was carried by appeal to the supreme court. (*Houston & Texas Ry. v. United States,* 234 U. S. 342, 58 L. Ed. 1341.) A few excerpts from the opinion of Mr. Justice Hughes are in point:

"The rates on these lines from Dallas and Houston, respectively, eastward to intermediate points in Texas, were much less, according to distance, than from Shreveport westward to the same points. It is undisputed that the difference was substantial, and injuriously affected the commerce of Shreveport. . . . Manifestly the order might be complied with, and the discrimination avoided, either by reducing the interstate rates from Shreveport to the level of the competing intrastate rates, or by raising these intrastate rates to the level of the interstate rates, or by such reduction in the one case and increase in the other as would result in equality. . . . We find no reason to doubt that Congress is entitled to keep the highways of interstate communication open to interstate traffic upon fair and equal terms. That an unjust discrimination in the rates of a common carrier, by which one person or locality is unduly favored as against another under substantially similar conditions of traffic, constitutes an evil, is undeniable. . . . Reading the order in the light of the report of the Commission, it does not appear that the Commission attempted to

Railroad Co. v. Utilities Commission.

require the carriers to reduce their interstate rates out of Shreveport below what was found to be a reasonable charge for that service. So far as these interstate rates conformed to what was found to be reasonable by the Commission, the carriers are entitled to maintain them, and they are free to comply with the order by so adjusting the other rates, to which the order relates, as to remove the forbidden discrimination. But this result they are required to accomplish." (pp. 346, 349, 353, 360.)

And so here with equal force we may hold that the state legislature, and the public utilities commission operating under its authority, are entitled to keep the highways of intrastate commerce open to intrastate traffic upon fair and equal terms; and a discrimination in rates in favor of all the wide region lying between the Pittsburg coal district and the Hutchinson-Kanopolis salt district against Concordia, under conditions of traffic presumably similar and certainly not shown to be dissimilar, is an evil which can not be tolerated.

It follows that the decision of the district court must be reversed and the case remanded with instructions to dissolve the injunction. As no affirmative relief was prayed for by the defendant it should be awarded its costs and the case should be dismissed. It is so ordered.

MARSHALL, J., not sitting.