No. 29,061.

THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, THE KANSAS CITY SOUTHERN RAILWAY COMPANY, THE MISSOURI-KANSAS-TEXAS RAILROAD COMPANY, THE MISSOURI PACIFIC RAILROAD COMPANY and THE ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, *Appellees*, v. THE PUBLIC SERVICE COMMISSION OF THE STATE OF KANSAS and THE LAWSON SAND AND MATERIAL COMPANY (Intervener), *Appellants*.

(287 Pac. 608.)

Opinion filed May 3, 1930.

*Charles W. Steiger, C. J. Putt, James E. Smith,* all of Topeka, *O. Q. Claflin, Jr.,* of Kansas City, and *Bernard L. Glover,* of Kansas City, Mo., for the appellants.

*William R. Smith, Alfred G. Armstrong,* both of Topeka, *W. W. Brown,* of Parsons, *W. P. Waggener,* of Atchison, *W. F. Lilleston,* of Wichita, and *H. F. Moore,* of Kansas City, Mo., for the appellees.

The opinion of the court was delivered by

HARVEY, J.: This is an action by five railway companies, as common carriers of freight, to enjoin the public service commission of the state from putting into force an order of defendant made April 30, 1927, in a proceeding before it (docket No. 8743) in which the Lawson Sand and Material Company was complainant and these five railway companies and four others were defendants, by which order defendants were "notified and required to establish on or before May 30, 1927, . . . and thereafter to maintain and

apply to the transportation of sand, in carloads, from Shockey, Kansas," to certain destinations in southeastern Kansas, "rates per net ton which shall not exceed the rates on like traffic from Grinter, Kansas, to the same destinations," on the ground that the rates fixed by such order are unjust, unreasonable, discriminatory, unduly preferential, confiscatory and unlawful. The Lawson Sand and Material Company intervened. Answers and other appropriate pleadings were filed and there was a trial on the merits. The trial court made findings of fact and concluded that the order was "unjust, unlawful and unreasonable, and unduly preferential," and rendered judgment for plaintiffs. The defendant and the intervener have appealed.

Appellees moved to dismiss the appeal for the reason that after the trial court had filed its findings of fact and conclusions of law appellants filed no motion to set aside any of the findings or to modify them, no motion for additional findings or for judgment on the findings, and for the reason that the motion for a new trial was general in its terms and was not argued, hence the trial court was never at any time advised of specific objections which the defendant and the intervener had to the findings, conclusions and judgments of the court, or of any specific reason why a motion for a new trial should be granted, citing *Brick v. Fire Insurance Co.*, 117 Kan. 44, 230 Pac. 309, and allied cases. But the record does not bring this case within the rule there stated. In this case, a request having been made that the court make findings and conclusions, at the close of the evidence the court asked counsel to submit suggested findings of fact and conclusions of law. Counsel for each side prepared and submitted such suggested findings and conclusions. Considering these and the evidence, the court prepared findings of fact and conclusions of law, but before filing them sent copies to counsel for suggestions. A day was set for hearing and counsel for defendant and for the intervener argued at length and in detail their objections to the findings and conclusions as prepared by the court. Counsel for plaintiffs also made an argument, after which the court, with one modification which is not material, filed the findings of fact and conclusions of law as prepared by the court. In due time the defendant and intervener filed their motion—

". . . to set aside the findings of fact and verdict, special verdict, judgment and decision heretofore rendered in this cause and grant a new trial, for the following reasons: I. Because of erroneous rulings of the court. II. Be-

cause the findings of fact and verdict, report or decision are in whole or in part contrary to the evidence. III. For newly discovered evidence," etc.

(Since no new evidence was offered in support of the motion this ground becomes unimportant.) The motion for a new trial· was ruled upon on a regular day for the hearing of motions. Counsel for the defendant and the intervener were not present, but the court was fully advised of their objections to the findings, conclusions and judgment of the court, and so stated in the journal entry overruling the motion. We regard the case, therefore, as governed by the rule stated in *Beam v. Farmers Union Mutual Hail Ins. Co.*, 127 Kan. 234, 273 Pac. 440, where it was held:

"Where a motion for a new trial was made upon alleged grounds that had been duly presented by oral argument and citation of authorities to the court in the course of the trial, the fact that counsel· was not present and did not orally repeat the arguments when the motion was considered does not warrant the overlooking of the grounds assigned nor a denial of a review of those errors."

The record before us, therefore, is sufficient to enable appellants to have considered the questions presented by them.

The findings are exceptionally complete. Appellants complain that in some respects they are not supported by the evidence, but from examination, not only of the abstract but of the transcript, we find this complaint not to be well taken. It is also argued that the findings are in some respects inconsistent, but a careful examination of them discloses that this point is not well taken. There is not much controversy about the law of the case. It is conceded that, generally speaking (R. S. 66-101 *et seq.*), the public service commission has authority to establish rates for intrastate shipments, subject to a review by a proceeding such as this as to whether they are just, reasonable, preferential, discriminatory, or confiscatory. Since the public service commission is organized and equipped to deal with questions of rates, courts should be slow to set aside their orders (*Railroad Co. v. Utilities Commission*, 95 Kan. 604, 623, 148 Pac. 667), but when their orders are attacked in court and it becomes clear, under the evidence and rules of law pertaining thereto, that the order complained of is unjust, unreasonable, unduly preferential and unjustly discriminatory, the court should not hesitate to set it aside.

For many years sand for commercial purposes has been produced by sand plants located at points on the Kansas river from Topeka

to Kansas City, and on the Arkansas river from Wichita to Arkansas City, and shipped in carloads. Much of this sand is used in certain districts in southeastern Kansas, and hence the sand plants, wherever situated, seek to obtain such a freight rate as to have this market available to them. The Union Pacific railroad runs from Topeka to Kansas City on the north side of the river. At Muncie, about one mile west of the Kansas City switching district, is a sand plant on the Union Pacific railroad. The Kansas City, Kaw Valley & Western Railway, hereafter called the Kaw Valley, an electric line, runs from Lawrence to Kansas City on the north side of the river. On this line at Sirridge, within the Kansas City switching district, is a sand plant, and another at Grinter, about two miles west of the Kansas City switching district. There are other sand plants within the switching district of Kansas City. Rates from Kansas City apply from all sand plants within the shipping district of Kansas City. Shipments from Grinter, Muncie and Sirridge, through Kansas City to southeastern Kansas, are interstate shipments, and the rates are regulated by orders of the interstate commerce commission. When the railroads were under federal control and all operated as one line of railroad an order was made by the interstate commerce commission that shipments of sand from Grinter and Muncie through Kansas City to southeast Kansas should take the same rate as shipments from Kansas City (51 I. C. C. 350; 55 I. C. C. 683; 68 I. C. C. 111). After federal control of railroads ceased and the roads were turned back to the respective railway companies in March, 1920, the railroads applied to the interstate commerce commission for an increased rate for the shipments from Grinter and Muncie through Kansas City, for the reason that they are not actually within the switching district of Kansas City. This application was denied. (78 I. C. C. 687.) These rulings were based largely on the near location of the sand plants to each other, and the fact that their methods of producing sand and their distributing points were similar. The Santa Fe railway company has a line of road from Topeka to Kansas City on the south side of the Kansas river, and has a line of road south from Lawrence, and another from Holliday making southeastern Kansas connections, and also a line of road from Holliday north to Atchison. This line crosses the Union Pacific and Kaw Valley railroads at Bonner Springs. Served by the Santa Fe there were sand plants at Topeka and at Lawrence, and at Turner, east of Holliday, and other

plants inside of the switching limits of Kansas City. Shipments of sand from Grinter and Muncie and Sirridge via the Santa Fe to southeast Kansas points were ordinarily routed through Bonner Springs instead of Kansas City. If the shipments were via other railroads, plaintiffs herein, the routing was through Kansas City.

Sometime in 1922 the Diplomatic Gravel Company of Galena, Kan., complained to the public service commission of rates applicable to crushed rock and chats moving intrastate between points in Kansas. On consideration of the complaint the commission, on its own motion, decided to inquire into the reasonableness of rates on sand, gravel, etc., moving within the state, and by its order of July 5, 1922 (docket No. 4882) opened up a general investigation of such rates. Notice was given to the carriers, to shippers, and to the public, and a hearing was had, after which, and on September 6, 1922, the commission found the existing rates to be unjust, unreasonable and discriminatory; that the great volume of the commodities involved moved on specific commodity rates between points on the carriers' lines, which had not been shown in all instances to be unreasonable, and that rate relationships exist between shipping points through the establishment of the specifics mentioned, which should not be disturbed, and further found that the only feasible remedy to apply under the circumstances was to establish a reasonable maximum mileage scale of rates between all points in Kansas. The commission therefore ordered the carriers to establish between all points in Kansas mileage rates to be observed as maximum, superseding all intrastate mileage rates in effect and to alternate with the specific rates then in effect, which maximum rates were to be as per a schedule contained in the order. This schedule provided rates per 100 pounds applicable to single-line hauls, to which was added one cent per 100 pounds if the haul was over two lines of railroad, and one and one-half cents per 100 pounds if the haul was over three or more lines of railroad. The rate was graduated as to distance. The minimum distance prescribed in the order was 40 miles, and the maximum rate for that distance for a single-line haul was 3.5 cents per 100 pounds. Other rates for single-line hauls, varying up to 13 cents, were prescribed for distances varying up to 500 miles. This increased rate when the shipment moved over two or more lines of railroad was claimed by the carriers because of the expense of transferring a shipment from

one line of railroad to another, and also the accounting between the companies made necessary thereby, and it was recognized by the commission as being fair and reasonable. It is a difference generally recognized in rate making. The rates so prescribed by this order were put in effect by the carriers. The sand plant at Lawrence had a more direct line for the shipment of sand to southeast Kansas, and soon dissatisfaction developed among the producers who had plants at Kansas City, Topeka, and along the Arkansas river. These producers filed a complaint before the commission and the case was reopened for hearing. On May 15, 1923, an order called "the second supplemental order" was made modifying the order of September 26, 1922. We need not detail these modifications. In the making of this order the sand producers of Lawrence had not participated, and on their complaint the commission again reopened the case and made a "fifth supplemental order" dated January 29, 1924. In this order the claim of the Lawrence producers for a low rate because of short mileage was in part ignored on the theory that what was best for the majority of the producers was the best disposition that could be made of the matter. By this order the principal sand-consuming territory in southeast Kansas was divided into two districts, which came to be known as territory A and territory B. The commission found that the carriers' proposed basis of 6½ cents per 100 pounds from the Arkansas river and Kansas river sand-producing points to destinations in territory A, "via routes over which specific commodity rates on sand are now published," is just and reasonable and should be approved; also that the proposal of the carriers as to territory B, "to apply the single-line mileage scale prescribed in our original order in this case to the average of the short-line distances figured via the shortest workable routes from each of said sand-producing points on the Kaw river to each destination point in said territory via routes over which specific commodity rates on sand are now published from the respective sand-producing points, plus one-half cent per 100 pounds, is reasonable and should be approved"; also that the sand-producing points on the Arkansas river had never been grouped in the making of sand rates into territory B, and that from those points the mileage rates originally prescribed in the case should apply. The commission ordered the rate of 6½ cents on sand in carloads from sand-producing points on the Arkansas river between

Wichita and Arkansas City, and from sand-producing points on the Kansas river between Topeka and Kansas City to destinations in territory A via routes "over which specific commodity rates on sand were then published from the respective sand-producing points," and also ordered rates from sand-producing points on the Kansas river from Topeka to Kansas City to destinations in territory B, "by applying the single-line mileage scale prescribed in our original order in this case to the average of the short-line distances via the shortest workable routes from each of said sand-producing points on the Kaw river to each destination point in said territory via routes over which specific commodity rates on sand are now published from the respective sand-producing points, plus one-half cent per 100 pounds," and that the mileage rates on sand in the original order shall apply in territory B from each sand-producing point on the Arkansas river.

It should be noted that this "fifth supplemental order" modifies but does not supplant the original order of September 6, 1922. And the modification relates only to shipments to points in territories A and B, the boundaries of which territories were stated in the order. The result was that, no matter what the distance from any sand plant considered was to the point of destination in territory A, whether that distance was 100 miles or 200 miles, the rate was 6½ cents per 100 pounds, if the shipment was a single-line haul. Witnesses for the plaintiffs and the intervener in this case differed as to the interpretation of this order as to whether the 6½-cent rate just referred to applied on a single-line haul only; but the order in question applied that rate "via routes over which specific commodity rates on sand are now published," and such rates were published on single-line hauls only. No other reason is suggested for using that language in the order, and this is the interpretation given to the order by the commission in the report filed in connection with the order sought to be enjoined in this case, for in that it was said, referring to this "fifth supplemental order," "With respect to territory A this order resulted in the establishment of a rate of six and one-half (6½) cents per hundredweight via single-line routes only." More than that, the carriers put in the rate on that interpretation of the order, and no showing is made that the public service commission ever at any time objected to the rates promulgated in accordance with such interpretation.

With the rate matters in the situation as above stated the Lawson

Sand and Material Company, in July, 1926, established a sand plant at Shockey, Kan., on the line of the Kaw Valley Railroad, 37 miles west of Kansas City and 4.3 miles east of Lawrence. The Kaw Valley railroad crosses to the south side of the river at Lawrence, but has no physical connection there with the Santa Fe railroad. It does have physical connection with the Union Pacific on the north side of the river at Lawrence. The Kaw Valley promulgated a rate of $10 per car for switching from the sand plant at Shockey to the Union Pacific at Lawrence, thereby placing Shockey, for the purposes of sand shipments, within the shipping district of Lawrence. For shipments of sand from Shockey to southeastern Kansas the shipment would necessarily move over two or more lines of railroad, and the rates applicable were those provided by the original order of September 6, 1922 (docket No. 4882). In October, 1926, the Lawson Sand and Material Company filed a complaint before the public service commission (docket No. 8743) that the rate from Shockey to southeastern Kansas destinations in territories A and B were unjust, unreasonable and unduly prejudicial as compared with rates from competing sand-producing points located in Missouri and Kansas for the same destination territory. On the hearing of this complaint the order was made April 30, 1927, which was sought to be enjoined by this action. We note that in this hearing other producers having plants at other points on the Kansas river, or on the Arkansas river, were not invited to be heard. The order made is stated early in this opinion. It will be noted that the order provided that the rates from Shockey should not exceed rates on like traffic from Grinter to the same destination. It might just as well have read from Kansas City instead of from Grinter, for by the rulings of the interstate commerce commission previously cited Grinter and Muncie were, with respect to rates on sand, treated the same as though they had been located within the shipping district of Kansas City, and the rates from Kansas City applied to shipments from those points. It cannot be said that the interstate commerce commission contemplated that the Kansas City rates should apply to shipments from Lawrence, or from a plant within the Lawrence shipping district, for in a hearing before the interstate commerce commission (*Jackman & Jackman v. A., T. & S. F. Ry. Co.*, 118 I. C. C. 547) it was found that the rates on sand in carloads from Lawrence to destinations within a radius of 150 miles east of Kansas City would be unreasonable and unduly

prejudicial to the extent they exceeded 20 cents per ton of 2,000 pounds, the rates from Grinter, Muncie and other Kansas City sand plants to the same destination. The additional charge over the rate for the mileage basis for a one-line haul, when the haul was over two or more lines, held to be reasonable and put into effect by the order of the public service commission of September 6, 1922, was not generally abrogated by the interstate commerce commission in the orders above referred to, nor by the second or fifth supplemental order above mentioned (docket 4882). It is a proper charge to be taken into consideration in rate making, and the carriers have at all times contended that it should be taken into consideration. The order sought to be enjoined removes that distinction so far as shipments from Shockey are concerned, but does not remove the distinction so far as shipments from Topeka or from plants on the south side of the river at Lawrence, or plants located on the Arkansas river. The order sought to be enjoined gives shipments from Shockey an undue advantage in rates over shipments from other points to destinations in the same territory in southeastern Kansas. Many illustrations of that are computed and set forth in the findings of the trial court. It seems as unreasonable to give Shockey the same rate as Kansas City for shipments to southeastern Kansas as it would be to give to plants on the south side of the river at Lawrence the same rate as Kansas City on shipments moving east of that point. To give to shipments from Shockey the rate prescribed for a single-line haul to destinations in southeastern Kansas over which the haul would be on two or more lines of road is unduly preferential as against the plants situated at other sand-producing points from which shippers into the same territory are required to pay the rate for a two- or three- or more line haul.

As a practical matter in the actual movement of shipments of sand from Grinter, Muncie and Sirridge to southeastern Kansas points on the line of the Santa Fe railway the shipments do not go through Kansas City, but move west to Bonner Springs, where they are transferred to the Santa Fe line; and to points on the line of the Santa Fe railway in southeast Kansas shipments taken at Bonner Springs are handled the same, whether they reach Bonner Springs from the plants at Grinter, Muncie and Sirridge, east of Bonner Springs, or whether they reach it from the plant at Shockey, west of Bonner Springs. It is argued that this fact

justifies the order sought to be enjoined. If the order in question were limited to rates to destination points on the Santa Fe railroad south of Bonner Springs there would be force in the argument, but the order is not so limited, and the merits of such an order are not before us, hence we cannot pass upon them. The order is applicable to each of the railroads named as defendants in the order, five of which are plaintiffs herein. To reach the lines of these railroads, other than the Santa Fe, shipments from Shockey have to move through Kansas City, or through Topeka, or Junction City, or be transferred from the Santa Fe at some point south of Bonner Springs. The result of the order sought to be enjoined is therefore to disturb existing rates from each of the sand-producing points on the Kansas river and on the Arkansas river to destinations in the designated territory. And this order was made without hearing the shippers from such points, or the consumers at points of destination. The fact that the order gives shipments from Shockey a lower rate to destinations in the described territory than exist for shipments into the same territory from many other sand-producing points makes the order unduly preferential. If the establishment of the sand plant at Shockey required an adjustment of existing freight rates on sand the inquiry as to the appropriate order should have been as extensive as the effect of the order to be made. Here the inquiry was limited, and the order limited in its wording, but its effect was to disturb existing rates from many other shipping points. Taken as a whole, it seems clear that the order made was unreasonable and unduly preferential, and therefore unlawful.

The judgment of the court below is affirmed.