(March 25, 1925.)

CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COM-
PANY, OREGON-WASHINGTON RAILROAD &
NAVIGATION COMPANY, GREAT NORTHERN
RAILWAY COMPANY, NORTHERN PACIFIC RAIL-
WAY COMPANY, SPOKANE INTERNATIONAL
RAILWAY COMPANY, Appellants, v. PUBLIC UTIL-
ITIES COMMISSION OF THE STATE OF IDAHO,
Respondent.

[238 Pac. 970.]

AUTHORITY OF FEDERAL GOVERNMENT TO ADVANCE INTRASTATE RAIL-
ROAD RATES AS WAR EMERGENCY MEASURE—TERMINATION OF AU-
THORITY—AUTHORITY OF STATE PUBLIC UTILITIES COMMISSION TO
REDUCE INTRASTATE WAR RATES—RATES VOLUNTARILY ESTAB-
LISHED BY CARRIER PRESUMED REASONABLE—PRINCIPLES OF RATE
ADJUSTMENT—WHAT MAY BE CONSIDERED ON APPEAL FROM ORDER
OF STATE COMMISSION.

1. Authority to make and enforce intrastate rates without
regard to state action was included in the powers given the
President by the acts of August 29, 1916 (39 Stats. L. 645,
chap. 418; Comp. Stats. 1916, sec. 1974a), and March 21,
1918 (40 Stats. L. 451, chap. 25; Comp. Stats. 1918, sec.
3115-¾a), to take over and operate the railroad transporta-
tion systems as a war emergency measure. After such railroads
were restored to their owners this power given to the federal gov-
ernment, by these acts, over intrastate rates ceased, and the state
Public Utilities Commission had authority to restore or make re-
ductions in such intrastate rates without going into a hearing of
the whole rate structure.

2. Where the federal government, in the exercise of its war-time
power, advances intrastate rates under such emergency, when the
same has passed the state is not required to treat the increased
intrastate rates established in this manner as the fixing of a rea-
sonable rate, under peace time conditions, which the state Public
Utilities Commission cannot reduce without first having a hearing
and finding such advanced rate unreasonable and confiscatory.

Publisher's Note.

2. Control of federal government over intrastate rates, see notes
in 14 A. L. R. 454; 22 A. L. R. 1100.

3. Where a rate voluntarily established by the carrier has been in force for a long period, such rate may be presumed to be *prima facie* just and reasonable, and the burden is on anyone attacking the same to -show that the rate so fixed is unreasonable.

4. The rule that before the Public Utilities Commission may lower an existing rate it must first find that it is unjust or unreasonable does not apply to rates that have been established by the federal government under its war-time power, where such rates were advanced to meet the increased cost of operation of the transportation systems and to secure the government from ultimate loss from the pecuniary obligations which it assumed in taking over such systems under its war-time power.

5. Commodity rates cannot generally be considered upon manufactured products with fairness to both shipper and carrier except in conjunction with the entire traffic and the completed process of collecting the raw material and' subsequently distributing it as a finished product.

6. Under sec. 3, Sess. Laws 1921, p. 142, upon an appeal from an order of the Public Utilities Commission, the appeal must be heard upon the record of the commission as certified by it, and the review cannot extend further than to determine whether the commission has regularly pursued its authority, including the determination of whether the order appealed from violates any right of the appellant under the constitution of the United States or of this state.

APPEAL from orders of the Public Utilities Commission. *Affirmed.*

F. M. Dudley, W. A. Robbins, Thomas Balmer and C. H. Hartson, for Appellants.

The establishment of rates which are noncompensatory is violative of the fourteenth amendment to the federal constitution and of sections 1, 14 and 18 of article 1 of the constitution of Idaho, and these constitutional provisions are applicable not only to the business of the carrier as a whole but also to the transportation of each separate class of traffic.

Publisher's Note.
5. Matters to be considered in determining reasonableness of freight rates, see notes in Ann. Cas. 1916A, 8; Ann. Cas. 1918E, 1216.
Consideration of body of rates in determining reasonableness of rate on particular commodity, see note in 15 A. L. R. 185.

(*Northern Pac. Ry. Co. v. North Dakota*, 236 U. S. 585, 35 Sup. Ct. 429, 59 L. ed. 735; *Norfolk & West. Ry. v. Conley*, 236 U. S. 605, 35 Sup. Ct. 437, 59 L. ed. 745; *Brooks-Scanlon Co. v. Railroad Com.*, 251 U. S. 396, 40 Sup. Ct. 183, 64 L. ed. 323; *Vandalia R. R. Co. v. Schnull*, 255 U. S. 113, 41 Sup. Ct. 324, 65 L. ed. 539; *Morgan's L. & T. R. & S. S. Co. v. Railway Com.*, 127 La. 636, 53 So. 890.)

The Public Utilities Commission is not authorized to reduce rates unless it first finds that ˙such rates are unjust or unreasonable. (*Murray v. Public Utilities Com.*, 27 Ida. 603, 150 Pac. 47, L. R. A. 1916F, 756.)

The Interstate Commerce Commission can require an increase in intrastate rates to prevent such rates operating as an undue burden upon or unjustly discriminating against interstate commerce. (*Railroad Com. v. Chicago, B. & Q. R. Co.*,· 257 U. S. 563, 42 Sup. Ct. 232, 66 L. ed. 371; *State of New York v. United States*, 257 U. S. 591, 42 Sup. Ct. 239, 66 L. ed. 385.)

But where a reduction of intrastate rates is required to protect such rates against interstate rates, the remedy is with the state authorities. (*Railroad Com. v. Chicago, B. & Q. R. Co., supra.*)

The Public Utilities Commission cannot lawfully reduce rates upon the theory that such reduction is an act of policy and beneficial to the carrier. (*Interstate Commerce Com. v. Chicago & G. W. Ry. Co.*, 209 U. S. 108, 28 Sup. Ct. 493, 52 L. ed. 705; *Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Com.*, 262 U. S. 276, 43 Sup. Ct. 544, 67 L. ed. 981; *Chicago, M. & St. P. R. R. v. Wisconsin*, 238 U. S. 491, 35 Sup. Ct. 869, 59 L. ed. 1423; *Cincinnati, N. O. & T. P. Ry. Co. v. Interstate Commerce Com.*, 162 U. S. 184, 16 Sup. Ct. 700, 40 L. ed. 935; *Atchison, T. & S. F. Ry. Co. v. Interstate Commerce Com.*, 190 Fed. 591; *In re Wharfage Charges*, 23 I. C. C. 535; *In re Express Rates*, 24 I. C. C. 380; *Sioux City T. El. Co. v. C. M. & St. P. Ry. Co.*, 27 I. C. C. 457; *Western Passenger Fares*, 37 I. C. C. 1; *People v. Stevens*, 197 N. Y. 1, 90 N. E. 60; *People v. Stevens*, 203 N. Y. 7, 96 N. E. 114; *Havre etc. Bridge Co.*

*v. Towers,* 132 Md. 16, 103 Atl. 319; *Laird v. B. & O. R. Co.,* 121 Md. 179, Ann. Cas. 1915B, 728, 88 Atl. 347, 348, 47 L. R. A., N. S., 1167; *State Pub. Util. Com. v. Springfield G. & E. Co.,* 291 Ill. 209, 125 N. E. 891.)

The burden of proof was upon the commission. (*Interstate Commerce Com. v. Chicago G. W. Ry. Co.,* 209 U. S. 108, 28 Sup. Ct. 493, 52 L. ed. 705; *Cincinnati, N. O. & T. P. Ry. Co. v. Rankin,* 241 U. S. 319, 36 Sup. Ct. 555, 60 L. ed. 1022; *Chamber of Commerce v. S. Ry. Co.,* 22 I. C. C. 233; *National Wool Growers Assn. v. O. S. L. Ry. Co.,* 25 I. C. C. 675; *Memphis Freight Bureau v. I. C. R. Co.,* 27 I. C. C. 507; *Rosenblatt & Sons v. A. A. R. R. Co.,* 33 I. C. C. 324; *Capital City Oil Co. v. Y. & M. V. R. R. Co.,* 39 I. C. C. 141; *In re Coal Rates,* 23 N. M. 704, 171 Pac. 506.)

No inference as to the unreasonableness of the log rates as advanced pursuant to the Interstate Commerce Commission's Order in *Ex parte 74* and subsequently maintained by the carriers is to be drawn from the fact that for many years prior to 1918 they had maintained lower rates which they had voluntarily installed. (*Interstate Commerce Com. v. Chicago G. W. Ry. Co., supra; Southern Pac. Co. v. Interstate Commerce Com.,* 219 U. S. 433, 31 Sup. Ct. 288, 55 L. ed. 283; *People ex rel. N. Y. C. & H. R. Co. v. Public Service Com.,* 215 N. Y. 241, 109 N. E. 252; *Memphis Cotton Oil Co. v. I. C. R. R. Co.,* 17 I. C. C. 313; *Morgan Grain Co. v. Atlantic A. C. Ry. Co.,* 19 I. C. C. 460; *Excelsior from St. Paul, Minn.,* 36 I. C. C. 349; *New England Plaster,* 41 I. C. C. 687.)

Past practices of carriers in fixing log rates in expectation of receiving haul of manufactured product does not authorize commission to adopt such policy as a basis for prescribing rates. (*Southern Pac. Co. v. Interstate Commerce Com.,* 219 U. S. 433, 31 Sup. Ct. 288, 55 L. ed. 283; *Excelsior from St. Paul, Minn., supra.*)

Alfred A. Fraser, for Intervenor Western Pine Manufacturers' Assn.

The Public Utilities Commission was authorized to hold a hearing upon its order to show cause and to issue the order now in controversy.  (C. S., secs. 2450–2452, 2478, 2494, 2495.)

On appeal the court should uphold the order unless it is shown that there was no evidence to support the finding of fact or that the commission acted arbitrarily or without authority of law.  (Sess. Laws 1921, chap. 72, sec. 3.)

On appeal the court will not revise the commission's findings unless clearly erroneous.  (*Jacobson v. Wisconsin Cent. Ry. Co.*, 71 Minn. 519, 70 Am. St. 358, 74 N. W. 893, 40 L. R. A. 389; *Interstate Commerce Com. v. Chicago, B. & Q. Ry. Co.*, 186 U. S. 320, 22 Sup. Ct. 824, 46 L. ed. 1182; *Louisville & Nashville Ry. Co. v. Behlmer*, 175 U. S. 648, 20 Sup. Ct. 209, 44 L. ed. 309; *Louisville & N. Ry. v. United States*, 238 U. S. 1, 35 Sup. Ct. 696; *Elzaburu v. Chaves*, 239 U. S. 283, 284, 36 Sup. Ct. 47, 60 L. ed. 290; *Great Northern Ry. Co. v. Merchants Elevator Co.*, 259 U. S. 285, 42 Sup. Ct. 477, 66 L. ed. 943.)

The burden of proof rested upon the carriers to show that the existing log rates are just and reasonable, and they have failed to do so.  (10 C. J., sec. 686, p. 438; *Steenerson v. Great Northern Ry. Co.*, 69 Minn. 353, 72 N. W. 713; *Washington Southern Ry. Co. v. Commission*, 112 Va. 515, 71 S. E. 539; *Southern Ry. Co. v. Commission*, 42 Ind. App. 90, 83 N. E. 721; *Chicago etc. Ry. Co. v. State*, 35 Okl. 233, 128 Pac. 908.)

A. H. Conner, Attorney General, for Respondents.

WILLIAM A. LEE, C. J.—This is an appeal from a decision of the Idaho Public Utilities Commission made August 20, 1923, which required appellants to file tariffs making reductions in intrastate log rates to conform to reductions authorized by the Interstate Commerce Commission in *Reduced Rates*, decided May 16, 1922, *Order No. 13,293*, 68 I. C. C. 676, which reduced the rates one-half of the 25

per cent increase that had been made in 1920 by the Interstate Commerce Commission by Order *Ex parte 74.*

The act of Congress approved August 29, 1916 (39 Stats. L. 645, chap. 418; Comp. Stats. 1916, sec. 1974a; 9 Fed. Stats. Ann., 2d ed., p. 1095), gave the President power "in time of war . . . . to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable."

By proclamation of the President the railroads were taken over as a war agency on December 28, 1917, and were thereafter operated by the government until March 1, 1920. To meet the increased cost of operation and to secure the government from ultimate loss from the pecuniary obligations which it assumed, the Director-general of Railroads, by Order No. 28, effective June 25, 1918, increased, with few exceptions, all state and interstate freight and passenger rates 25 per cent. This order was made as a war measure, without hearing and without advance notice.

On March 21, 1918, dealing with the subject, Congress passed a law entitled, "An Act to Provide for the Operation of Transportation Systems while under Federal Control, for the Just Compensation of Their Owners, and for Other Purposes." (40 Stats. L. 451; U. S. Comp. Stats. 1918, U. S. Comp. Stats. Ann. Supp. 1919, secs. 3115¾a–3115¾p.) Section 10 of this act provided:

"That during the period of Federal control, whenever in his opinion the public interest requires, the President may initiate rates, fares, charges, classifications, regulations, and practices by filing the same with the Interstate Commerce Commission, which said rates, fares, charges, classifications, regulations, and practices shall not be suspended by the Commission pending final determination."

In *Northern Pac. R. Co. v. North Dakota ex rel. Langer,* 250 U. S. 135, 39 Sup. Ct. 502, 63 L. ed. 897, the federal

supreme court said that this section confers upon the government the complete and undivided power to fix rates during the period of federal control, that the complete and undivided character of the war power of the United States is not disputable, that to interpret the exercise of the power by the presumption of the continuance of a state power limiting and controlling the national authority was but to deny its existence, and that it is an elementary principal under the constitution that the authority of the government of the United States is paramount when exerted as to subjects concerning which it has the power to control. The contrary of this view, that this act did not apply to intrastate rates, is ably discussed in *State ex rel. Langer v. Northern Pac. R. Co.*, 43 N. D. 556, 172 N. W. 324, but in view of the paramount authority of the federal supreme court in construing these federal provisions, we must accept as authoritative the holding of the federal supreme court, that General Order No. 28, by the director-general, applied with equal force to intrastate rates.

Upon a return of the railroads to their owners, the Interstate Commerce Commission, acting pursuant to the provisions of sec. 15a of the Interstate Commerce Act as amended by the Transportation Act of 1920, sec. 422, Fed. Stats. Ann., 1920 Supp., at p. 111 (U. S. Comp. Stats. Ann. Supp. 1923, sec. 8583a) authorized a percentage increase in all interstate freight rates, the increase in the Mountain-Pacific group of railroads, which includes all Idaho roads, being fixed at 25 per cent (*Ex parte 74*, 58 I. C. C., at p. 246.) This increase applied to all classes and commodities of freight, including logs, and with few exceptions increases were made upon a percentage basis, the Interstate Commerce Commission saying, at p. 245:

"After carefully considering the situation we find that with the exceptions hereinafter noted general percentage increases made to fit the needs of the groups of lines serving each of the four groups must be considered for present purposes the most practicable. This conclusion is without

prejudice to any subsequent findings in individual situations.''

State regulating commissions generally authorized similar increases upon intrastate traffic, and this was done by the Idaho Public Utilities Commission, Order No. 713, issued August 28, 1920. After referring to the 25 per cent advance made by the director-general in June, 1918, by General Order No. 28, and the 25 per cent advance authorized by the Interstate Commerce Commission in its order *Ex parte 74, supra,* dated July 28, 1920, and made effective upon five days' notice, the state commission in its order said:

''That the authorization of the increase to said rates, fares and charges is not and shall not be construed as a finding by the Commission that such increase is reasonable or non-discriminatory, and in the event that the increase hereby authorized to any rate, fare or charge is hereafter attacked on the ground that same is unreasonable or discriminatory, or on any other ground, it shall then be incumbent upon the carrier affected to justify the rate attacked in the same manner as if such carrier were making application for authority to file same.'' (Eighth Annual Report, Idaho Public Utilities Commission, p. 92.)

It will thus be seen that the intrastate log rates in this state, as well as practically all other freight rates, were given two successive increases of 25 per cent each, without any notice of hearing by the Idaho Public Utilities Commission.

The deflation period in this country began to seriously affect business conditions during 1920, and this brought about reductions in the prices of labor, materials and supplies used by carriers and other business interests. The business situation was so serious that many °industries were facing insolvency. Freight rates remained at the highest point in history, and as a result of the general depression brought about by the deflation period there was a demand for lower freight rates in this state as well as throughout the country generally. A number of cases were decided by the Interstate Commerce Commission pertaining to particu-

lar industries, including the *Livestock Case,* 63 I. C. C. 107, the *Grain and Hay Case,* 64 I. C. C. 85, and *Southern Hardwood Case,* 66 I. C. C. 68, in all of which rates were reduced, although it was claimed by the carriers that their earnings did not meet the returns prescribed by sec. 15a of the Transportation Act, *supra.*

In the fall of 1921 the Interstate Commerce Commission had pending before it numerous petitions filed by the carriers and by various organizations of shippers, asking it to enter upon a general investigation into the reasonableness of existing rates and charges. After having served upon all common carriers subject to the Interstate Commerce Act notice of its action to institute an investigation, general notice was given to shippers and the public of a hearing to develop, *inter alia,* the evidence as to what extent rates should be further modified. *Reduced Rates, 1922,* 68 I. C. C. 676, Order No. 13,293.) After an extensive hearing the Commission found and determined (1) that on and after March 1, 1922, a fair return upon the aggregate value of the railway property of carriers defined in sec. 15a would be 5.75 per cent of such aggregate property, and that in the southern and Mountain-Pacific groups 12.5 per cent reduction should be made in all charges applicable to freight service of the increased rates of 1920, *supra,* and that on and after July 1, 1922, such increase would be unjust and unreasonable in the southern and Mountain-Pacific groups and should be 12.5 per cent instead of the 25 per cent authorized. (68 I. C. C., at pp. 734, 735.) Following this ruling the Idaho Public Utilities Commission, by Order No. 843, issued June 5, 1922, authorized rail carriers in the state, including appellants, to put into effect corresponding reductions in intrastate service.

The carriers had increased their rates in 1920 as authorized by I. C. C. Order, *Ex parte 74, supra,* and Idaho Public Utilities Commission Order No. 713. Therefore, when said order, No. 13,293, authorized the decrease of 12.5 per cent in rates, appellant carriers filed tariffs putting such decreased rates into effect upon all classes and commodities

of freight upon which the rates had not been theretofore reduced, except the rates for the transportation of logs. On September 22, 1922, the Idaho Public Utilities Commission, by Order No. 863, directed various railway companies, including appellants, to show cause at a hearing to be held on October 23, 1922, why an order should not be entered requiring the filing of tariffs making effective such reductions in the log rates. In response to this order answers were filed by appellants which were all substantially alike. They alleged they had put into effect reduced rates upon all classes of freight and commodities except saw-logs; that they had not put into effect the reductions in rates for the transportation of saw-logs, either interstate or intrastate; and that such reductions had not been made because the existing rates and charges for such transportation were unreasonably low and confiscatory and should be increased.

Appellants appeared at the time fixed for the hearing, and the state Commission held that the burden of proof was on the carriers. The carriers were permitted to introduce evidence on valuation, earnings and expenses of operation, the quantity movement of logs and the cost thereof. No evidence relative to the issues being tried was excluded, and the carriers were given an opportunity to present all evidence they saw fit to introduce upon the reasonableness of the log rates in the state of Idaho and the reasons for their failure to make a reduction on such rates.

The Western Pine Manufacturers' Association had been permitted to intervene on behalf of log shippers in the state, and by its counsel cross-examined the carriers' witnesses and also offered testimony in favor of the reduction in rates on logs which should correspond with the reduction which had been made upon all other classes and commodities of freight.

The Public Utilities Commission filed its decision August 20, 1923, and thereby required the carriers to file tariffs making reductions in intrastate log rates conforming to the reductions authorized by the Interstate Commerce Commission in *Reduced Rates, 1922, Order No. 13,293,* 68 I. C. C.

676, which would reduce the rates one-half of the 25 per cent increase which had been made in 1920 by Order *Ex parte 74, supra.*

The basis upon which this order was predicated is set forth in the opinion, and may be summarized as follows:

That the percentage increase in rates allowed in 1920 was not based upon any determination that any specific rates were insufficient, but that the rates as a whole were insufficient to produce the revenues which the Transportation Act of 1920 contemplated that the carriers, either as a whole or in groups, were entitled to earn; and that this increase, being applicable to all commodities, did not disturb the relationship theretofore existing between rates on different commodities.

That due to the decrease in operating costs, the necessity for the maintenance of the 1920 increase as a whole had ceased in 1922; and that therefore, as determined by the Interstate Commerce Commission, the rates so advanced should be decreased. That as the increase was upon the rates as a whole, and for the sole purpose of securing increased revenues to the carriers, and the 1922 decrease was due to a decrease in the cost of operating as a whole, the decrease ordered should be made applicable to all rates, and the relationship between the rates on different commodities thereby be maintained in making the decrease as it had been in making the increase.

That the parity between rates for the transportation of logs and the rates for the transportation of other commodities was voluntarily established by the carriers themselves; and that a change in the relationship of such rates would require a general hearing on the rates on all commodities, and might require a revision of the whole rate structure.

It was specifically stated that this "was not a rate hearing," but was a hearing for the purpose of giving the carriers an opportunity to show why they had not made reductions in the tariffs for the transportation of logs similar to the reductions made in other tariffs and in accordance with the

authority granted by the Commission's Order No. 843. And it was held that as the Public Utilities Commission had, without hearing, adopted the Interstate Commerce Commission's findings in advancing the state rates in 1918 and again in 1920, it would pursue this practice in ordering reductions; that therefore it adopted the findings of the Commission made in *Reduced Rates, 1922, Order No. 13,293, supra,* and ordered the reductions accordingly.

From this order of the Public Utilities Commission appellants prosecute an appeal to this court and upon assignments, of error that may be summarized as follows:

(1) The order of the Commission reducing the intrastate log rates in Idaho on the lines of the Chicago, Milwaukee & St. Paul Railway Company and of the Great Northern Railway Company reduces such rates to a basis which is noncompensatory and confiscatory, and operates to take the property of said companies respectively without compensation or due process of law and denies to such companies the equal protection of the law in violation of the fourteenth amendment to the federal constitution and secs. 1, 14 and 18 of art. 1 of the state constitution.

(2) The Commission erred in holding that the intrastate rates for the transportation of logs were unreasonable or discriminatory.

(3) In refusing to treat the proceeding as a rate case, and in holding that it was authorized to reduce the intrastate rates for the transportation of logs below the level of a reasonable and remunerative rate for the purpose of maintaining the existing relationship between rates upon other commodities.

(4) In considering that log transportation was productive of business for the carriers in the transportation of the manufactured lumber as a basis for the reduction of log rates.

Appellants contend that when the Interstate Commerce Commission, acting pursuant to the Transportation Act, advanced all interstate rates, it became the duty of the state Commission to similarly advance the corresponding intra-

state rates. Such advance of intrastate rates was made without investigation into the reasonableness of the resultant intrastate rates, because the advance was made to avoid discrimination against interstate commerce, in compliance with the request of the federal authorities; and the reasonableness of the interstate rate was a matter within the exclusive jurisdiction of the Interstate Commerce Commission. Appellants argue that in authorizing the advance under *Ex parte 74, supra,* the state Commissions acted as mere agents of the Interstate Commerce Commission, and under and by virtue of the paramount power of Congress. They contend that in making reductions, however, the situation is different; that the jurisdiction of Congress is limited to interstate commerce and it has no jurisdiction over intrastate commerce beyond the power to prohibit such action on the part of a state with reference to the regulation of rates as will burden or injuriously affect interstate commerce. As we understand their position, they concede that Congress cannot constitutionally prohibit a state from maintaining a schedule of intrastate rates which might be excessive and discriminatory, unless this is done in a manner and to an extent that it unduly burdens and obstructs interstate commerce, within the doctrine of the *Minnesota Rates Cases,* 230 U. S. 352, Ann. Cas. 1916A, 18, 33 Sup. Ct. 729, 57 L. ed. 1511, 48 L. R. A., N. S., 1151; that with this exception the question of whether intrastate rates are unreasonably high, is a question exclusively for the state authorities to determine, and that while the Interstate Commerce Commission may compel state Commissions to advance rates when burdensome on interstate rates, the authority to reduce them is solely with the state.

Appellants' position appears to be that although an intrastate transportation rate has been voluntarily established by the carrier and long adhered to without objection, where it has been peremptorily raised 55.25 per cent by the government under its asserted war power, after peace has been concluded and such paramount power over intrastate rates no longer exists in the federal government, the state

41 Idaho—13

Public Utilities Commission is without authority to restore the former rate or make any reduction until it goes into a hearing of the whole rate structure and finds the specific rate complained of to be in fact too high. We cannot assent to that proposition. Because the state yielded to the federal government in the exercise of its war-time power, it has not thereby surrendered its power to control intrastate rates when such emergency has passed, and it is not bound to treat the increased intrastate rate established in this manner as a reasonable rate which the state cannot reduce. Where a rate, voluntarily established by the carrier, has been enforced for a long period, such rate is to be regarded as *prima facie* just and reasonable, and the burden is on anyone attacking the same to show that the rate so fixed is unreasonable. (10 C. J., p. 427, sec. 667; *Louisville & N. R. Co. v. Finn*, 235 U. S. 601, 35 Sup. Ct. 146, 59 L. ed. 379.)

Appellants rely upon the pronouncement in *Murray v. Public Utilities Com.*, 27 Ida. 603, 150 Pac. 47, L. R. A. 1916F, 756, wherein it is said that before lowering an existing rate the Commission must first find that it is unjust or unreasonable. This states a correct rule of law applicable to the facts there under consideration, but the rule does not apply where the established rate has been raised by the federal government under its war-time power, and where such raise was made to meet the increased cost of operation of the entire transportation system and to secure the government from ultimate loss from the pecuniary obligations which it had assumed. That the rates before being thus arbitrarily and peremptorily increased had been reasonable may be presumed from the fact that they had been originally established by the carrier and had long been acquiesced in without complaint on the part of either the shipper or carrier. When it is considered that the conditions that gave rise to this increase had passed; that the federal government had restored the roads to their respective owners, and, acting through the instrumentality of the Interstate Commerce Commission, found that the conditions which had made these increased rates necessary had been removed and

ordered a corresponding reduction in interstate rates after an exhaustive hearing wherein findings were made and which findings and judgment the state Commission adopted as a basis for its action, it will readily be seen that the doctrine announced in the Murray case has no application to the facts of this case.

Appellants admit that ordinarily the burden of proof would be upon the carriers to show that the existing log rates are unjust, discriminatory, or so unreasonable as to be in effect confiscatory. They also concede that it is a settled rule of law that established rates are presumed to be reasonable and just, and that it would therefore follow that the burden of proof of establishing the rates complained of to be unjust or unreasonable must, in the absence of statutory provisions shifting such burden, rest upon the party attacking the justness or reasonableness of such rates, and cite many cases in support of these general propositions. They refer to certain recitals contained in the opinion of the state Commission, Order No. 713, above quoted, and say that if this provision in the order is valid it shifts the burden of proof upon the carrier to establish the reasonableness of the rates when assailed by the state Commission in this proceeding, and that such a rule is in excess of the Commission's authority and void, because it undertakes to prescribe a rule of evidence, a power not conferred upon the Commission. Granting this, for the sake of the argument, the foregoing excerpt from Order 713, authorizing an increase in rates, does not go further than to recite a correct rule of law applicable to the facts and circumstances then confronting the Commission. The rates in force in 1918 were peremptorily raised, without a hearing or investigation of any kind as to their reasonableness, by General Order 28, under the asserted power of the federal government, as a war measure. It is not worth while to pursue the inquiry as to whether or not Congress properly exercised its sovereign power in thus summarily advancing an intrastate rate. Nor can it be contended that under such circumstances the advancement of the rate in 1918 or the subsequent advance-

ment in 1920 was the voluntary act of the state Commission or done in response to its judgment. If the state authorities yielded to a superior power and raised the rates in obedience to the mandate of Congress, it cannot be logically contended that it was the voluntary act of the state Commission in establishing such rates. When it issued its show cause order to reduce rates to the extent of 12.5 per cent of the net advance of 55.25 per cent which the federal government had ordered the state to accept, the burden of proof would not shift to the state Commission to show that its former rates were not reasonable and just.

Section 3, Sess. Laws 1921, p. 142, provides that upon an appeal from an order of the Commission, no new or additional evidence may be introduced in this court, but the appeal shall be heard upon the record of the Commission as certified by it, and the review cannot extend further than to determine whether the Commission has regularly pursued its authority, including the determination of whether the order appealed from violates any right of the appellant under the constitution of the United States or of this state. That upon the hearing this court shall enter judgment either affirming or setting aside the order of the Commission.

The reason for the limitation upon the power of this court to review the judgments of the Commission is well stated in *Great Northern Ry. Co. v. Merchants' Elevator Co.,* 259 U. S. 285, 42 Sup. Ct. 477, 66 L. ed. 943, wherein it is said:

"To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function. Preliminary resort to the Commission is required alike in the two classes of cases. It is required because the inquiry is essentially one of fact and of discretion in technical matters, and uniformity can be secured only if its determination is left to the Commission. Moreover that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate

appreciation of which acquaintance with many intricate facts of transportation is indispensable; and such acquaintance is commonly to be found only in a body of experts.''

It appears from the record that a number of the carriers complied with the order of the state Commission and made the necessary reduction in rates recommended by it. Appellants have not done so and the Chicago, Milwaukee & St. Paul Railway Company and the Great Northern Railway Company earnestly insist that the rates complained of are confiscatory. If it were conceded, as appellants contend, which of course it is not, that the evidence shows that the existing rates are already insufficient to pay such returns upon the capital invested in the construction of these logging roads, that is, roads carrying logs, as the law prescribes to be a reasonable return upon the capital invested, it would not necessarily follow that the rates would be confiscatory for the reason that the evidence also tends to show that the rates paid the carriers for the hauling of logs from the forest to the mill is only one step in the process of reducing the lumber in the forest tree to the finished product and delivering the same to the ultimate consumer. That is to say, by far the greater percentage of lumber marketed from the logs carried by these roads is at an end haul extending to the Mississippi Valley states and occasionally to points beyond this region. The revenue derived from the shipment of logs from the forests, where they grow, to the mills, for the purpose of being sawed into the finished product, is only an incident to the traffic, and should not be considered as an independent rate, but the rate must be considered in connection with the entire revenue earned by the industry in the reducing of the forest tree to the finished product and marketing the same in the distant parts of the country where it is consumed. It is a matter of common knowledge that commodity rates on few, if any, manufactured products can be considered, with fairness to both shipper and carrier, otherwise than in conjunction with the entire traffic and a completed process, collecting the raw material and subsequently distributing it as a finished product. The reason-

ableness of rates on raw material is to some extent affected by the fact that the carrier will or will not transport the articles manufactured therefrom. (*Detroit etc. R. Co. v. Railroad Com.*, 171 Mich. 335, 137 N. W. 329; *Re Hudson Bay Mining Co. & G. N. R. Co.* (Can.), 24 W. L. R. 932.)

It is apparent that questions of this kind may only be determined by a Commission that has the power, facilities and necessary experience to consider all of these questions in their various ramifications, and that the machinery of the courts is not organized to deal successfully with such questions. Furthermore, as has been so frequently announced by the courts, this is a legislative, not a judicial, function, and it only becomes a matter in which courts may interfere when it clearly appears that the legislative department, acting through Commissions or otherwise, have established rates that are unjust and discriminatory. This is not made to appear in the instant case, but, on the contrary, it does appear that, making an exception in the case of this one commodity and withholding a reduction of the rates to the extent authorized by the Interstate Commerce Commission on logs, results in disturbing the whole structure.

For the reasons here assigned we conclude that the order appealed from should be affirmed.

Wm. E. Lee, Budge and Givens, JJ., concur.

Taylor, J., deeming himself disqualified, took no part in the decision.

Petition for rehearing denied.